115 N.J. Super. 286 (1971)
279 A.2d 709
STATE OF NEW JERSEY, COMPLAINANT-RESPONDENT,
v.
IN THE INTEREST OF R.W., JUVENILE-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued March 9, 1971.
Decided June 30, 1971.
*287 Before Judges LEWIS, GAULKIN and MINTZ.
Mr. William J. Rohr, Assistant Deputy Public Defender, argued the cause for appellant (Mr. Stanley C. Van Ness, Public Defender, attorney).
Mr. Martin R. Kayne, Assistant Prosecutor, argued the cause for respondent (Mr. Joseph D.J. Gourley, Passaic County Prosecutor, attorney; Mr. Archibald Kreiger, Assistant County Prosecutor, of counsel).
*288 The opinion of the court was delivered by GAULKIN, J.A.D.
R.W. was adjudged a juvenile delinquent upon a complaint which charged that at 11 P.M. on December 10, 1969, on Route 4, he "did * * * have in his possession a stolen bike * * * rings, key chains, one jacket, a hand flashlight and one knife, stolen from Gimble's [sic] and J.C. Penny's department stores, Paramus" and "the act or acts when committed by a person of the age of 18 * * * would be in violation of 2A:119-2." N.J.S.A. 2A:119-2 defines larceny as a misdemeanor when the value is under $200.
The principal ground of appeal is that the adjudication was based upon R.W.'s oral confession of theft which should not have been admitted in evidence. The State concedes that if the confession was improperly admitted, the adjudication must be reversed.
The Public Defender argues that the confession was inadmissible because made without the boy's parents or counsel being present, and without having given him all of the Miranda warnings. The brief also says, "The Court abused its discretion in failing to determine whether or not the confession was voluntary." It is not clear to us what appellant means by this last point. The argument made under it seems to be that, since it was apparent that the boy was very young and mentally deficient, the judge should have made more inquiry than did either counsel as to the circumstances surrounding the interrogation. But the case was tried without a jury; there was never any claim (and there is none in the brief) of threats, force, prolonged interrogation or improper means or influence exerted on the boy, or that the confession was untrue. Defense counsel asked no questions directed to this area, nor did he ask the judge to do so. The boy did not take the stand. Although we think the prosecution should have developed the facts and the happenings, from arrest to interrogation, more fully, we do not think the case should be remanded for such proof, since appellant does not claim anything would be discovered other *289 than the age of the boy, his low mentality, the place of interrogation and the lateness of the hour when he was questioned, which we already know.
R.W. was born in August 1957 and was just over 12 years old when he and his companion, W.T., 15 years old, were taken into custody and then to Paramus police headquarters. The record does not disclose the circumstances of the arrest; whoever arrested them did not testify.
Detective Plucinsky, assigned to the juvenile bureau of the Paramus police department, whose workday ended at 11 P.M., was summoned from his home and arrived at headquarters at 12:45 A.M. When he asked the boys their names and addresses, they gave fictitious names and false addresses in Paterson. The detective called the Paterson police to reach the parents; the Paterson police reported that "the two addresses were a burnt-out home and a vacant home." The detective told the boys that if he "didn't get their correct names, addresses and phone numbers, [he] would be forced to place them in the [Juvenile] Shelter," but they continued to refuse to give their true names and addresses.
The boys had been found in possession of the items enumerated in the complaint. In response to the detective's questions, R.W. picked out certain ones and said he had stolen them from department stores whose names he did not remember. These items carried Gimbel's or Penney's stock and price tags. The others, he said, were stolen by his companion.
We are told that the boys were then placed in the shelter. The shelter learned their names and notified their parents to be in Bergen County Juvenile Court at 9 A.M. The parents of neither boy appeared at that time, and the Bergen County Juvenile Court transferred the case to the Passaic County Juvenile Court, probably because the boys lived in Passaic County and were already under the supervision of that court.
We are informed by the Public Defender that R.W.'s contact with the Juvenile Court dates back to June 7, 1967, when R.W. was not quite ten years old. On that date he *290 was found guilty of breaking, entering and larceny and placed on probation under the supervision of a minister. In October 1968 six more complaints against him of larceny were sustained. This time he was sent to the Diagnostic Center at Menlo Park for examination. The Center reported that he was a "borderline mentally-retarded child with an I.Q. of 72." Because of this and its other findings, the Center recommended that he be placed in a training school "such as the Elwyn School in Pennsylvania or the E.R. Johnstone Training and Research Center." However, these are private schools; a judge may not commit to them; the parents must apply for such placement. Apparently R.W.'s mother opposed such a placement. Consequently, R.W. was continued on probation.
On May 21, 1969 defendant (and four other boys) was again charged with breaking, entering and larceny in a dwelling. This complaint was sustained on June 19, 1969, and he was again placed on probation. Then, in December 1969, came the present arrest.
Probably because of the boy's previous record, the case was placed on the "formal" calender (R. 5:9-1) and the Public Defender was assigned to represent him. The case was tried on January 5, 1970.
The State produced no evidence other than the detective's account of the confession and the items which the boy admitted he stole. The Public Defender offered no evidence.
After both sides rested and defendant's motion for acquittal was denied, the judge sustained the complaint. He then asked defendant's father (who was present) and the Public Defender for suggestions as to what disposition should be made of the boy. They offered none. Thereupon the judge, after reviewing the boy's record and the probation officers' reports, said that Johnstone Training and Research Center (hereafter Johnstone) would have been the best place for the boy but, since the mother refused to send him there, the best place to which he had power to commit him was the Skillman Training Center, a division of the State Home *291 for Boys. He felt he had to send him there because of his repeated misdeeds and "because he's getting absolutely no supervision at home and * * * we're never going to be able to do anything with him as long as he's home." Consequently, he committed him "to the State Home for Boys * * * with the specific request that he be assigned to Skillman * * * and if the father or the mother can arrange a private school placement anywhere else, I'll recall him."
(Parenthetically, we note that during the discussion with counsel and the father before the boy was committed it was reported that "R. informed Mr. Donati [his probation officer] that he did not care what happens to him. He doesn't care if he is sent to Jamesburg. He also asked Mr. Donati to place him in the Shelter for Christmas because he wanted some peace and quiet * * *")
Apparently, neither the father, counsel nor the judge knew that, in July 1969, the boy's mother had changed her mind and had applied, through the Board of Children's Services, to have him admitted to Johnstone. Why he was not then admitted we do not know. However, after he reached Skillman, it was arranged (on the basis of the mother's application of July 1969 or a later one) that he enter Johnstone. To enable him to do that, he was paroled from Skillman, his attendance at Johnstone being made a condition of his parole.
Shortly after entering Johnstone, and while home on furlough, he and other juveniles allegedly broke, entered and committed larceny. Even though defendant was then on parole from Skillman, the last-mentioned complaint against him was placed on the inactive list "until R.W.'s attendance at Johnstone is concluded." He was returned to Johnstone, where he is now.
The Public Defender filed this appeal in February 1970, when defendant was in Skillman. When he appeared before us the Public Defender knew nothing of what had happened to the boy since that date. Neither did we. Consequently, *292 we asked him to find out and he reported to us the facts above set forth.
Since it appeared that the boy, with the approval of the mother, now is in the place apparently best equipped to help him, and another charge is hanging over his head if he leaves Johnstone, we asked the Public Defender to inquire whether the boy and his parents desired that the appeal go forward. The Public Defender reported to us that he had spoken to the mother over the telephone and had tried to explain all of the pertinent considerations to her; he was not sure she was able to comprehend them, but she did say she wanted the boy home and, since a reversal might accomplish that purpose, she wanted the appeal to go forward. Apparently neither the boy nor his father has been consulted. The Public Defender deems it his duty to follow the mother's directions. Hence we proceed to decide the appeal.
The Public Defender contends that the Miranda warnings given defendant were not complete because they did not include a statement that, if he wanted a lawyer to advise him whether to answer questions, one would be assigned to represent him without cost.
The detective testified that, prior to the questioning:
I advised the boys of their rights to remain silent * * * that they were entitled to an attorney, and * * * that anything they said to me * * * could be used against them in any trial or hearing.
When the detective was asked what R.W. had said, the Public Defender said, "Objection to any further questions * * * it is an improper foundation." This may have been insufficient to alert the court to what counsel had in mind, for when the detective said he had "advised the boys * * * that they were entitled to an attorney" he may have meant that he told them one would be assigned free of charge if they wanted one. Had counsel been more specific, the detective might have been asked to be more explicit. Likewise, if the Public Defender had objected on the ground that it had *293 not been established that the confession was in fact voluntary, the court might have gone into that more fully.
When the Public Defender moved for an acquittal, he argued that the confession should not have been admitted because, due to his tender age and low mentality, the boy did not "have any knowledge of what was being said to him. It's not a question of his not being able to understand English * * *." In the course of his argument the Public Defender said that when he interviewed the boy, after his assignment, "he didn't even know he was allowed a lawyer or was going to have a lawyer." Only in passing did he allude to the lack of specific proof that defendant had been told a lawyer would be assigned if he wanted one. However, he made no claim that the confession was untrue or obtained by threats, force, prolonged interrogation or other improper means, and he makes no such claim now. The question therefore narrows down to the effect of (1) the allegedly incomplete Miranda warnings, and (2) the absence of parent, adviser or counsel during the interrogation.
We agree that even if the Miranda warnings had been letter perfect, this boy did not have the age, mentality, schooling (he was in the third grade) or experience to understand them well enough to knowingly and intelligently choose whether or not to talk or to ask for a lawyer.
When a defendant over 18 is charged in a criminal court, a confession obtained without the Miranda warnings may not be introduced in evidence by the State as part of its direct case. On the other hand, if the warnings are given and the defendant elects to confess without a lawyer, we conclude (whether he is 18 or 80) that he "knowingly and intelligently waived" his privilege against self-incrimination. This conclusion probably is a legal fiction, for few laymen are equipped to make such a choice, since it involves an understanding of the charge, the possible defenses, the nature of the evidence against defendant and how it was obtained, the presumption of innocence and the burden of proof, etc., which only those trained in crime or in the law possess. *294 There are policy considerations which justify our indulging in that fiction  the chief one being that otherwise no one 18 or over could be questioned without a lawyer present to explain to him in detail what he will waive if he does waive.
The same legal fiction has been indulged in juvenile courts with reference to admissions by juveniles approaching 18. See, for example, West v. United States, 399 F.2d 467 (5 Cir.1968), cert. den 393 U.S. 1102, 89 S.Ct. 903, 21 L.Ed.2d 795 (1969), in which a 16-year-old boy confessed to auto theft after being given the Miranda warnings, but without parents or counsel present, and it was held that the confession was properly admitted; see also, People v. Lara, 67 Cal.2d 365, 62 Cal. Rptr. 586, 432 P.2d 202 (Sup. Ct. 1967), cert. den. 392 U.S. 945, 88 S.Ct. 2303, 20 L.Ed.2d 1407 (1968). But when the age (or the mentality) of the youth falls below a certain level, the Miranda warnings, no matter how perfectly given, must mean little or nothing to him. We cannot say with certainty what that age level is. Unfortunately, juvenile courts deal with children as young as eight. Children of tender years may understand each word of the Miranda warnings when plainly and clearly given; they may have street or movie knowledge about the right to keep silent and to demand a "mouthpiece," but, nevertheless, up to a certain age they cannot be deemed to be able to waive the Miranda privileges. Query, then, are they not to be questioned at all?
Even Justice Fortas did not say that in In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). Gault did not deal with pre-adjudicatory admissions but with the proceedings at the adjudicatory trial. Yet even at such a trial Justice Fortas called for "due process standards intelligently and not ruthlessly administered," and he recognized "that special problems may arise with respect to the waiver of the privilege [against self-incrimination] by or on behalf of children, and that there may be differences in technique  but not in principle  depending upon the *295 age of the child and the presence and competence of parents * * *."
In short, the Miranda rule and its corollaries are not to be mechanically  "ruthlessly"  applied when dealing with juveniles of tender age. We think that instead the test must be whether the juvenile was treated with the utmost fairness and with every consideration that his age and all of the surrounding circumstances indicate should have been accorded him. That includes having his parents present, whenever possible, and giving the Miranda warnings on the chance that the boy or his parents may understand them  not as mechanical preconditions to the reception of admissions, as the oath is a precondition to the reception of testimony, but rather as facts tending to show that the admissions were in fact voluntary.
Before Gault was decided, our Supreme Court said, in State in the Interest of Carlo, 48 N.J. 224 (1966), that, whenever possible, the juvenile's parents should be present during his interrogation. In his concurring opinion the Chief Justice said that the purpose of their presence is not to make sure the infant receives the Miranda warnings or to protect him against self-incrimination or to decide for him whether to waive his rights (which the parents may have no right to do), but rather to make sure that the interrogation itself was fairly conducted and the boy's statements are true.
If a boy is not old enough to understand the Miranda warnings and the constitutional provisions against self-incrimination, and he answers upon the instruction of his parents, he has not knowingly and intelligently waived whatever rights against incrimination he has; he has merely obeyed his parents. Is such a boy, therefore, not to be questioned at all, or his admissions excluded from evidence?
Although Gault (which was decided after Carlo) probably made it necessary to give juveniles (and their parents, if present) the Miranda warnings, we think that, at least with reference to pre-adjudicatory interrogation, it did not fasten *296 upon the juvenile court all of the automatic and mechanical results of noncompliance with Miranda which follow in the criminal courts.
If the parents cannot or will not appear, the warnings should be given anyway, as a practical matter, against the possibility that the youth might understand and act upon them. But if the child is not old enough to understand and waive, and the parents cannot be found or cannot or will not attend, we hold that the questioning may go forward, even without the Miranda warnings, provided it is conducted with the utmost fairness, without force or other improper influence, mental or physical, and in accordance with the highest standards of due process and fundamental fairness. Unless the case clearly appears to be one which will be transferred to the criminal courts, we do not think that counsel must be assigned at that point simply because the parents cannot be present, although it is always desirable to have counsel present if one is readily available.
It must be remembered that children as young as eight are taken into custody for reasons other than the commission of crime; N.J.S.A. 2A:4-14 lists 12 such categories, including such things as habitual vagrancy, idly roaming the streets at night, knowingly associating with thieves or vicious or immoral persons, etc. N.J.S.A. 2A:4-32 directs that, whenever possible, all children under 16 be released in the custody of the parents. R. 5:8-2 provides:
(a) Custody; Release without Detention. A law enforcement officer may take into custody without process any juvenile who in his opinion is engaging in conduct defined by law as juvenile delinquency. Such action shall not be construed as an arrest but shall be deemed a measure to protect the health, morals, and well-being of the juvenile. The officer taking the juvenile into custody shall make immediate arrangements to have the juvenile taken to his home, where he shall be released in the custody of his parents, guardian, or custodian, upon the written promise of such person to assume responsibility for the presence of the juvenile in court should a hearing be scheduled; or the juvenile may be released in the custody of a probation officer or other person designated by the court.
(b) Detention of Juveniles; Notice to Court. If it is impracticable for the officer to proceed in accordance with paragraph (a) of this *297 rule after taking the juvenile into custody, or if the nature of the offense requires his immediate detention, the officer shall make immediate arrangements to place the juvenile in a detention facility approved by the court. * * *
(c) Complaint. Whenever a juvenile has been taken into custody in accordance with this rule, the officer taking the child into custody or his superior officer shall forthwith file a complaint with the court in accordance with R. 5:8-1.
State v. Smith, 32 N.J. 501 (1960), recognized that, in spite of the peremptory language of the statutes and the rules, it is almost always necessary to ask the juvenile some questions before releasing him or returning him to his parents. Obviously, it is necessary to learn his name, where he lives, the names of his parents and their telephone number, if they have one. But must the questioner stop there? The child may have an explanation for his conduct which would entitle him to instant release, without complaint or further record, or immediate delivery to his home without strings attached. As the Supreme Court said in Smith, the authorities have "a definite obligation of the highest order" not to subject juveniles "to any kind of a formal charge without * * * investigation." Therefore, said the court:
* * * we do not conceive that R.R. 6:8-3(b) and (c), [now R. 5:8-2] in speaking of an officer who has taken a juvenile into custody without process making "immediate arrangements" to have him removed to his home or placed in an approved detention facility, requires that such must necessarily be done before the police are afforded a reasonable opportunity to question, where that course is desirable or important. Especially is this true in a situation like the instant one where the crime was most serious and the police information of somewhat doubtful character. Under such circumstances, confinement, even in a juvenile detention facility to await juvenile court hearing, is not justified in the absence of something more trustworthy than hearsay. Suspects might well be able to satisfy the authorities of their innocence and be entitled to be released completely as a result of the interrogation. * * *

* * * * * * * *
Although defendants do not explicitly say so in their brief, it appears nonetheless to be suggested that at least the spirit of our juvenile rules precludes police questioning of juvenile suspects. We should consequently make it clear that our practice does not contemplate any such blanket prohibition. Speaking generally, talking to *298 people and asking them questions, whether they be suspects or not, is a standard and most essential element of crime solution and law enforcement. While police brawn and bluster to extort confessions cannot be a substitute for brains and leg work and will not be countenanced, the public interest requires that interrogation, and that at a police station, not completely be forbidden, so long as it is conducted fairly, reasonably, within proper limits and with full regard to the rights of those being questioned. [32 N.J. at 533-534]
Suppose a ten-year-old boy is found late at night sleeping in an automobile and, when awakened, runs away. Apprehended and brought to headquarters, may he not be asked, without waiting for his parents to arrive, whose car it was, why he was sleeping in it and why he tried to run away? It may be that it was his father's car, that his father was visiting nearby and that, frightened, he was running to seek his father. Or he may answer that he ran away from home or was lost. If it is proper to ask these questions without waiting for the parents  and we think it is  does it serve any purpose to require the police to give such youngsters the Miranda warnings before asking the questions, for fear that the boy might say he ran because he had stolen, robbed or burned?
Suppose the boy answers that he was afraid to go home because he had stolen a neighbor's purse, or set fire to a house, or pushed a playmate off a roof to his death, or that the car was stolen and the trunk was full of stolen goods which he was guarding. Are those admissions to be barred because the Miranda warnings were not given? If they are, it must be remembered that the police might be barred from using even that proof which they might thereafter obtain of the theft, the fire or the homicide because it was fruit of the poisonous tree, and the boy might then go without the help or correction which he needed and which the Juvenile Court was designed to give him. As the Chief Justice said in Carlo:
With respect to crime, we suppress the truth even if it means the release of one who is plainly guilty, and this in the belief that the *299 support thereby given a constitutional value outweighs the price tomorrow's victims may pay. I would suggest that it need not follow that the same course should be pursued with respect to juvenile delinquency, since as to it there is still another value to be weighed, to wit, the rehabilitation of the infant. To deny an infant the attention he needs because the police erred in obtaining evidence of that need may not be the parental thing to do. [48 N.J. at 245-246]
It may be argued that when the juvenile does make inculpatory admissions in the absence of his parents, the admissions should not be admitted unless they are later repeated in the presence of parents or counsel, after Miranda warnings. Such repetition may be desirable, but why should it always be necessary? It must be remembered that thousands of juveniles are questioned annually, and that all but a very few are restored to their parents forthwith, even after admissions of what, done by an adult, would be considered serious crime. To require such double questioning against the possibility that this might be the one case in which the boy might be sent away would add a large and unnecessary burden and mean added delay, even in the release of the boy to his parents.
Pursuant to R. 5:9-1 we now have in the Juvenile Court a "formal" and "informal" trial list. The rule provides that "All juvenile complaints which in the opinion of the judge may result in the institutional commitment of the juvenile shall be listed on the formal calendar"; all others on the informal one. In cases on the formal calendar, counsel is assigned to represent the indigent juvenile, the prosecutor may appear for the State, and the proceedings are conducted with formality. Complaints listed on the informal calendar are conducted "in summary manner and may result in any disposition provided in R. 5:9-9 except commitment." R. 5:9-1(e)
It may be argued that in cases which are destined for the formal calendar, interrogation of the youth should be forbidden unless parents or counsel are present and Miranda strictly obeyed, and that confessions obtained without these *300 safeguards be excluded in formal calendar adjudicatory proceedings.[1]
We think such distinctions impractical. When an officer first questions a youngster just taken into custody, he has no way of knowing whether there will be any complaint against him, much less whether the complaint will be on the formal or informal calendar. He has no way of knowing what his answers will be and, as the Supreme Court said in State v. Smith, supra, 32 N.J. at 530, with reference to a parallel question, "the police could not know whether, if and when there was enough to fairly charge the defendants as the guilty parties, the juvenile court would later direct adult prosecution or retain the matter for protective and rehabilitative treatment under the Juvenile Court Act."
Justice Harlan, concurring in Gault, rejected the selective as well as the mechanical application of Miranda to juvenile cases. The true test, he said, was due process and fundamental fairness; whether or not the Miranda warnings were given is only one fact to be considered with all the facts to determine whether that test was met; and any difference in calendar, the title of the proceeding or the definition of the offense could not justify a greater or lesser need of the Miranda warnings. He said:
It must be remembered that the various classifications of juvenile court proceedings are * * * often arbitrary or ambiguous [as between truancy, etc. and crimes]; it would therefore be imprudent, at the least, to build upon these classifications rigid systems of procedural requirements which would be applicable, or not, in accordance with the descriptive label given to the particular proceeding. It is better, it seems to me, to begin by now requiring the essential elements of fundamental fairness in juvenile courts, whatever the label given by the State to the proceeding; * * *. [387 U.S. at 77, 87 S.Ct. at 1469.]
Under our rules the juvenile may not be committed if his case is on the informal calendar. But he may be adjudged a *301 delinquent; in that case he may be placed on probation, and for violation of that probation he may be committed. State v. Interest of G.J., 108 N.J. Super. 186 (App. Div. 1969); but see Gutierrez v. State ex rel. Wichita County, 433 S.W.2d 777 (Tex. Civ. App. 1968).
In short, we think the same rules should govern the admissibility of juvenile admissions, whether the adjudication is on the formal or informal calendar; the test is due process and fundamental fairness, and the giving of the Miranda warnings is not an absolute necessity in every case but an important element in determining whether the admission was truly voluntary.
We believe that Gault does not compel a contrary conclusion. Gault dealt only with proceedings at the adjudicatory hearing. Justice Fortas stated for the majority that:
We do not in this opinion consider the impact of these constitutional provisions upon the totality of the relationship of the juvenile and the state. We do not even consider the entire process relating to juvenile "delinquents." For example, we are not here concerned with the procedures or constitutional rights applicable to the pre-judicial stages of the juvenile process. * * * We consider only the problems presented to us by this case. These relate to the proceedings by which a determination is made as to whether a juvenile is a "delinquent" * * *. [387 U.S. at p. 13, 87 S.Ct. at 1436]
The court expressly stated that it did not pass upon Gault's pre-adjudicatory admissions to probation officers.
The question then comes down to this: Was the confession here involved voluntary and obtained with due process and fundamental fairness? We think it was.
Here the detective tried at once to reach the parents, but he was unable to do so because the boys concealed their names and addresses. Under the circumstances, we think it was proper for the detective to continue the questioning. Appellant's companion was 15 years old, and it was possible that appellant was the wholly innocent companion of the thief. In any event, it was important to know which of the items enumerated in the complaint were stolen, from whom, *302 how, etc., not with a view to building an ironclad case against R.W. but with the purpose of doing what proper police work requires  determining the facts, the ramifications and accomplices, if any, the true owners, etc.
It was the detective's duty to determine whether to release the boys or whether to have them detained "in a detention facility approved by the court" pending further investigation and complaint. To determine this, the detective needed to ask questions. And having properly asked the questions, the answers were properly admitted in evidence.
The other points raised by the Public Defender do not require extended comment. We have studied them and find in them no reason to reverse the judgment.
Affirmed.
NOTES
[1] Comment, "A Balancing Approach to the Grant of Procedural Rights in the Juvenile Court," 64 Nw. U.L. Rev. 87 (1969), suggests such an approach but recognizes its drawbacks. Cf. Rodriquez v. Rosenblatt, 58 N.J. 281 (1971).