975 A.2d 1060 (2009)
409 N.J. Super. 99
STATE of New Jersey in the Interest of A.S.
DOCKET NO. A-5747-07T4.
Superior Court of New Jersey, Appellate Division.
Argued May 6, 2009.
Decided August 12, 2009.
*1062 Jay L. Wilensky, Assistant Deputy Public Defender, argued the cause for appellant A.S. (Yvonne Smith Segars, Public Defender, attorney; Mr. Wilensky, of counsel and on the brief).
Eric M. Mark, Assistant Prosecutor, argued the cause for respondent State of New Jersey (Wayne J. Forrest, Somerset County Prosecutor, attorney; Michael McLaughlin, Assistant Prosecutor, on the brief).
Ronald K. Chen, Acting Child Advocate, for amicus curiae Office of the Child Advocate (Joastrid Glading, Assistant Public Advocate, Joseph F. Suozzo, First Assistant Child Advocate, and Christopher G. Jackson, Assistant Child Advocate, on the brief).
Ann Milgram, Attorney General, for amicus curiae Office of the Attorney General (Leslie-Ann M. Justus, Deputy Attorney General, of counsel and on the brief).
Before Judges A.A. RODRÍGUEZ, PAYNE and WAUGH.
The opinion of the court was delivered by
PAYNE, J.A.D.
A.S., a fourteen-year-old girl, was charged with one count of conduct which, if committed by an adult, would constitute first-degree aggravated sexual assault, commission of an act of sexual penetration on a victim who is less than thirteen years of age, N.J.S.A. 2C:14-2a. Following a determination that the four-year-old victim, C.J., was competent to testify, a delinquency hearing, together with a hearing to determine the admissibility of A.S.'s confession, was held in the Family Part. After denying A.S.'s motion to suppress her confession, the judge ruled that A.S. was guilty as charged. She was sentenced to the Juvenile Justice Commission for one year, but the sentence was stayed pending sex offender treatment at Haven Home and completion of two years of probation. A.S., who was found to be subject to Megan's Law, was also prohibited from contact with the victim and from unsupervised contact with children under the age of twelve. Minimum sex offender and other *1063 customary fines and penalties were imposed. A.S. has appealed.
On appeal, A.S. raises the following arguments for our consideration:
POINT ONE
THE JUVENILE'S STATEMENT WAS TAKEN IN VIOLATION OF HER RIGHTS AGAINST SELF-INCRIMINATION, AND THE SPECIFIC ADDITIONAL RIGHTS AFFORDED TO JUVENILES, NECESSITATING SUPPRESSION AND REVERSAL. U.S. CONSTITUTION, AMENDS V, XIV; N.J. CONST. (1947), ART. 1 PAR. 10.
A. Even Under Standards Applicable to Adults, the Juvenile's Statement Was Taken in Violation of Her Right to Silence.
B. The Questioning Was Particularly Improper In Light of the Special Protections Afforded to Juveniles.
C. Suppression of the Juvenile's Statement Requires Reversal.

I.
A.S. is the adoptive daughter of F.D., with whom A.S. has lived since the age of eleven.[1] A.S.'s natural mother is an active substance abuser who abandoned A.S. at the age of nine; the whereabouts of her father are unknown. A.S. and F.D. reside in a duplex residence. F.D.'s daughter, T.B., and the victim, T.B.'s four-year-old son, C.J. (F.D.'s grandson), live in the other half of the home. On November 25, 2007, while A.S. was babysitting for C.J., she committed fellatio on the child, paused to remove her retainer, and then continued the act for a total of approximately ten minutes. At its conclusion, A.S. cautioned the child not to tell his mother, but on the following night, after his bath, C.J. did so, telling T.B. that A.S. "was kissing on [his] balls and sucking on [his] tinky."
Upon learning of A.S.'s conduct, T.B. summoned F.D. from next door, and when she had arrived, T.B. asked C.J. to repeat his story. Believing the story to be true, F.D., by then very angry, went back to her house to get A.S., who commenced to cry and to state "I didn't do nothing" even before accusations had been leveled against her. During the next forty minutes, A.S. continued to deny that she had committed a sexual assault on C.J. Nonetheless, T.B. called the police.
On the following morning, in the presence of F.D., T.B. and an aunt, A.S. allegedly confessed to the crime and stated that she did not know why she did it. Thereafter, C.J. was interviewed by a detective with the county prosecutor's office, and later in the day, A.S. was interviewed in the presence of F.D. by Jorge Ramos, a detective in the office's sex crimes unit.
The interview with A.S. was videotaped. However, the visual and sound quality of the videotape is poor, and it is therefore difficult, at times, to discern precisely what was said. The extreme antagonism of F.D. toward A.S. and the reluctance of A.S. to speak are nonetheless clear.
Because, on appeal, A.S. has challenged the admissibility of her confession on various grounds, we describe its circumstances in some detail.[2] After a few preliminaries, *1064 Ramos commenced the interview by requesting that F.D. read to A.S. her Miranda[3] rights, which she did without elaboration, asking after reading each right whether A.S. understood, and receiving a slight nod. There then ensued a lengthy discussion between Ramos and F.D. regarding F.D.'s right to be present for the interview, together with A.S.'s analogous right to her mother's presence, both of which F.D. contended were poorly drafted in a "double-folded" fashion. At the conclusion of the discussion, F.D. asked A.S.: "So what do you want to do?" When no response was received, F.D. then asked: "Do you want to talk to the police or you don't want to talk to em?" Again, A.S. did not immediately respond, but eventually answered: "I don't know."[4] To this, F.D. responded: "Well you have to answer it, this is what the papers are for. He has to know, are you gonna talk to him or you're not going to talk to him?" Again there was no response from A.S. As F.D. waited for a reply, she checked off that A.S. had understood each of the Miranda warnings and she signed both the Miranda form and the parental presence form. A.S. did not.
Eventually, F.D. asked A.S. if she wanted a lawyer. When asked by A.S. "what it is a lawyer do," F.D. responded: "Suppose to represent you."
After further delay and some inaudible comments, F.D. stated:
Well at some point in time you gonna have to talk. You ain't been saying nothing anyway. And you ain't gon do nothing but lie to him anyway. We already know you did it, what you did. And you get (inaudible) rights.
Without obtaining consent from A.S., F.D. then told Ramos: "You can question her, but I'll be present when you question her." At this point, A.S. signed the waiver form, throwing the pen down after doing so.
Although the waiver had been executed, Ramos sought a further response as to whether A.S. wanted a lawyer. In that connection, the following colloquy took place:
JR: Okay, do you want to have an attorney present while I'm asking questions?
AS: Then what would an attorney do?
JR: Well an attorney would represent you.
AS: So it would talk for me?
JR: Umm no, no.
AS: Then what would it do?
JR: Well what, well what he would do is he would represent you legally, okay. At some point.
FD: And they make sure
JR: They make sure you get
FD: your rights are not violated.
JR: violated.
FD: And if you think he's ... asking you something that you shouldn't be answering, that's why it's asking you if you want an attorney. The attorney can't speak for you, he can represent you. When the questions are asked, you have to answer the question.
JR: And the attorney (inaudible) like your mom said the attorney is there to be sure that your rights aren't violated, um that, that I'm *1065 ah you know advised you of what your rights are, that you're being advised. Um but he can't, you know you're the only one that can actually speak the truth here. So he's not going to speak for you.
A.S. was not then asked whether she wished an attorney. Instead, F.D. expressed impatience because A.S. was delaying the process and declared that she hoped A.S. would answer "some of them questions, cause she needs to do just like that."
Ramos then commenced the interview by stating that he expected the truth, that "the truth is only gonna help you," that "an attorney that's an assistant prosecutor was gonna review all this information," and "the more truthful you are and more complete you are, okay, the better it looks for you, okay."
At the outset of the interview, Ramos conducted the questioning, which was met by partial responses and long pauses. As time went on, F.D. again expressed her impatience, stating: "If you tell what happened, then you don't have to sit there all this time trying to figure out how you're gonna figure out some lie." Ramos then added: "We can't help you if you don't help us." Once more, F.D. expressed certainty as to A.S.'s guilt, stating: "Tell him what happened, [A.S.] Don't be embarrassed. He already knows. See he already done talk to C.J., so you might as well just go ahead and tell him." After Ramos assured A.S. that she should not be embarrassed, F.D. again acknowledged A.S.'s guilt, stating:
If she was so embarrassed she would've never done what she did in the first place. Tell him what you did, [A.S.] We cannot sit here all day long for you to stare at the man, tell him what happened.
By this point A.S. had stated that "it" happened on Sunday in her bedroom and that C.J. was wearing pajamas. After Ramos had asked whether C.J.'s pajamas were pulled down and received no answer, F.D. took over the interrogation until she finally got a response that C.J. had pulled them down. Ramos then resumed the questioning, eliciting, after many pauses, A.S.'s admission that she had "sucked [C.J.'s] tinky" for about ten minutes, told C.J. not to tell anybody, and then went to sleep. A.S. was arrested and confined for a period of ninety-three days.
As we stated previously, a suppression hearing occurred during the course of A.S.'s delinquency hearing to determine the admissibility of her confession. Although A.S. did not testify at the trial itself, she did testify at the hearing, stating at that time that she was in the ninth grade, but read at a third-grade level.[5] When asked whether she had understood her Miranda rights, A.S. responded, "[s]ome of it." She indicated that she understood the role of attorney to be to "make sure when people are questioning you that they don't ask you something that is not supposed to be asked or something. I didn't know that they do what you do." On cross-examination, A.S. explained that she did not request an attorney because she "felt as though there was no reason because they didn't do anything. They just sat there."
A.S. was also asked her understanding of the right to remain silent. The following colloquy occurred:
Q. What about the right to remain silent? What did you understand that to mean?

*1066 A. That if I didn't want to say anything I didn't have to talk.
Q. And is that what you did?
A. Yeah. But I still got asked a question and stuff.
Q. Did you feel pressured to answer?
A. Yeah.
Q. Did you  do you consider what you said to be voluntary?
A. What do you mean by that?
Q. Did you want to say what you said or did you 
A. No, I didn't want to answer.
A.S. provided a further description of her understanding of her rights on cross-examination, stating that although she was informed that she had a right to remain silent, "[w]hen I would remain silent they kept on asking me the same questions over and over again for me to answer. They never said that I had to say, no, I don't want to talk no more. It says remain[] silent and that's what I had did." Then on re-direct examination, A.S. described what she thought would happen if she did not answer by testifying: "I don't know what would happen so that's why after a while they kept asking me, I finally just answered some of them  most of them. Because I didn't really know what would happen or what wouldn't happen." Nonetheless, A.S. admitted that she thought something bad would occur.
A.S. confirmed that, during the course of the long interview, which was extended well beyond the confession while Ramos sought to determine the level of A.S.'s sexual experience and the potential origin of her impulse to commit an act of fellatio, she never became tired or exhausted. And she confirmed that Ramos had never yelled at her or threatened her.
At the conclusion of the suppression hearing, defense counsel argued that A.S. did not understand either her right to an attorney or the right to remain silent, which she attempted to invoke. Additionally, counsel argued that A.S.'s statements to Ramos were not voluntary. Instead, she was badgered to confess by a mother who actively participated in the interrogation process. Further, counsel argued that, during the interview, F.D. protected the rights of her grandson, C.J., and not her daughter. Counsel stated:
I think it is just abundantly clear that [A.S.] was an afterthought. And after this happened [A.S.] never went home again. Her mother didn't want her to come home.
As I recall at our hearing for her placement and detention, when she was ready to come home, she couldn't come home. And I don't know if the mother is rescinding the adoption or what is going on. It is all in flux.[6]
At the conclusion of the hearing, the Family Part judge ruled that A.S.'s statement to Ramos was admissible. However, in this connection, he found it "a little unusual" and "probably not the best police practice" for the mother to have administered the Miranda warnings. Additionally, the judge accepted A.S.'s statement that she read at only a third-grade level, but found that her level of intelligence was "totally appropriate to a 14-year-old" and that there were no impairments whatsoever to A.S.'s comprehension and intelligence. The judge noted that A.S. had questioned what the role of an attorney would be, and he found that the explanation given by Ramos and F.D. was "quite good" and "certainly adequate." Although *1067 A.S. acknowledged that she understood that her waiver of rights could be rescinded, the judge noted that she never asserted her desire to stop questioning. Further, the judge found that F.D. was not coercive, but he agreed that her anger was "very clear." However, he concluded, "that anger had to do with what she believed [A.S.] had done ... and [A.S.'s] reluctance to answer the questions" and that F.D.'s emotional state did not taint the interview. The judge concluded by stating:
I find that [A.S.] was not confused. She was reluctant. Absolutely. And she explained why. Because she was embarrassed. She knew what she did was wrong. She told us at the beginning before she began answering. I am embarrassed. And so that made her reluctant. And she was not coerced, as I said by the detective or her mother.
A finding of delinquency followed.

II.
To admit the confession of a juvenile over the age of fourteen, the State must demonstrate, beyond a reasonable doubt that the statement was knowingly, intelligently, and voluntarily given. State v. Presha, 163 N.J. 304, 313, 748 A.2d 1108 (2000). Whether those conditions have been met depends upon the judge's evaluation of the totality of the circumstances surrounding the interrogation. Ibid. Factors to be considered include "the suspect's age, education and intelligence, advice as to constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature, and whether physical punishment or mental exhaustion was involved." Ibid. (quoting State v. Miller, 76 N.J. 392, 402, 388 A.2d 218 (1978)). The suspect's "prior encounters with the law" are also relevant in this regard. Ibid. (quoting Miller, supra, 76 N.J. at 402, 388 A.2d 218).
As the Court held in Presha, "[t]he role of a parent in the context of a juvenile interrogation takes on special significance." 163 N.J. at 314, 748 A.2d 1108 (citing In re Carlo, 48 N.J. 224, 225 A.2d 110 (1966)). In this regard, the parent serves as an advisor to the juvenile, providing a measure of support in the unfamiliar setting of a police station. Presha, supra, 163 N.J. at 314, 748 A.2d 1108. For that reason, the parent and child must have a reasonable opportunity to consult on such matters as whether the right to avoid self-incrimination should be waived. Ibid. (citing Garrett v. State, 265 Ind. 63, 351 N.E.2d 30, 33 (1976)). Additionally, because a goal of juvenile adjudications is rehabilitation, the presence of a parent not only protects the juvenile's interests, but ensures the truthfulness of statements made by the juvenile to the police. Ibid.
However, as noted by the Court, because "punishment has now joined rehabilitation as a component of the State's core mission with respect to juveniles," a parent's role takes on a "new significance." Id. at 314-15, 748 A.2d 1108.
When young offenders are in custody, the parent serves as a buffer between the juvenile, who is entitled to certain protections, and the police, whose investigative function brings the officers necessarily in conflict with the juvenile's legal interests. Parents are in a position to assist juveniles in understanding their rights, acting intelligently in waiving those rights, and otherwise remaining calm in the face of an interrogation.
[Id. at 315, 748 A.2d 1108 (citing Gallegos v. Colorado, 370 U.S. 49, 54, 82 S.Ct. 1209, 1212-13, 8 L.Ed.2d 325, 329 (1962))].
*1068 For these reasons, the absence of an adult from the interrogation of a juvenile over the age of fourteen is considered a "highly significant factor" in determining the voluntariness of a juvenile confession.[7]Ibid.
The necessity of adult protection was emphasized by the United States Supreme Court in Gallegos v. Colorado, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962). There, the court observed in connection with a juvenile boy:
[A] 14-year-old boy, no matter how sophisticated, is unlikely to have any conception of what will confront him when he is made accessible only to the police. That is to say, we deal with a person who is not equal to the police in knowledge and understanding of the consequences of the questions and answers being recorded and who is unable to know how to protect his own interests or how to get the benefits of his constitutional rights.
[Id. at 54, 82 S.Ct. at 1212, 8 L.Ed.2d at 328.]
The Court additionally emphasized that the child "would have no way of knowing what the consequences of his confession were without advice as to his rights  from someone concerned with securing him those rights  and without the aid of more mature judgment as to the steps he should take in the predicament in which he found himself." Id., 82 S.Ct. at 1213, 8 L.Ed.2d at 329. See also In re Gault, 387 U.S. 1, 55, 87 S.Ct. 1428, 1458, 18 L.Ed.2d 527, 561 (1967) ("the greatest care must be taken to assure that ... [a child's confession] was not the product of ignorance of rights or of adolescent fantasy, fright or despair."); Haley v. Ohio, 332 U.S. 596, 599-600, 68 S.Ct. 302, 303-04, 92 L.Ed. 224, 228-29 (1948) ("[When], as here, a mere child  an easy victim of the law  is before us, special care in scrutinizing the record must be used. Age 15 is a tender and difficult age for a boy of any race. He cannot be judged by the more exacting standards of maturity.").
When an adult is unavailable or determines not to be present at the interrogation, the "police must conduct the interrogation with `the utmost fairness and in accordance with the highest standards of due process and fundamental fairness.'" Presha, supra, 163 N.J. at 317, 748 A.2d 1108 (quoting In re S.H., 61 N.J. 108, 115, 293 A.2d 181 (1972) and State v. R.W., 115 N.J.Super. 286, 296, 279 A.2d 709 (App. Div.1971)). The voluntariness of a juvenile's confession is evaluated from the juvenile's perspective. State in the Interest of Q.N., 179 N.J. 165, 174, 843 A.2d 1140 (2004).
When we view the confession of A.S. in light of the standards established by the Court, we have a number of concerns. First of all, we note that A.S. was just fourteen years of age at the time of her interrogation. The Court has held with respect to those thirteen or younger that the juvenile's "immaturity so limits [their] ability to make a knowing and intelligent waiver of rights that an added layer of protection [afforded by the presence of a parent] is required." State v. A.G.D. 178 N.J. 56, 67-68, 835 A.2d 291 (2003); see also Q.N., supra, 179 N.J. at 172-73, 843 A.2d 1140. We do not regard passage from thirteen to fourteen necessarily to be accompanied by new-found maturity and wisdom. That observation may be particularly true in the present case, involving a juvenile with a third-grade reading level. Although that deficiency could be attributed *1069 to disruption in schooling caused by her insecure childhood, A.S.'s low intelligence was undoubtedly a contributing factor, as well. The level of A.S.'s understanding of her rights thus must be judged after consideration of her intellectual deficits.
We note further in this regard that the Court has required that a parent have a reasonable opportunity to "consult" with her child regarding any proposed waiver of Miranda rights. In the present matter, such consultation did not occur, either in the presence of Ramos or outside his presence, which we would deem preferable. At this "critical stage" of the proceedings, Q.N., supra, 179 N.J. at 176, 843 A.2d 1140, Ramos handed the rights form to F.D. to read to A.S.  a step that the experienced Family Part judge found "unusual" and "not the best police practice"  and A.S.'s alleged "understanding" of her rights was obtained in a wholly pro forma manner. Nothing done by F.D. at this point contributed to A.S.'s comprehension of the rights that she was being urged to waive, and no discussion took place either as to whether waiver was an appropriate course for A.S. to take or what the practical consequences of such waiver would be.[8] Moreover, A.S., who had no experience with the criminal law, was unable to rely upon prior knowledge in this regard. Compare Presha, supra, 163 N.J. at 309, 748 A.2d 1108 (noting the juvenile's fifteen prior arrests and finding them relevant to the voluntariness of his waiver of rights). As the Court observed in In re S.H., 61 N.J. 108, 293 A.2d 181 (1972), a juvenile "cannot make a knowing and intelligent waiver of something he cannot understand." Id. at 115, 293 A.2d 181. In this important area,
we cannot give any weight to recitals which merely formalize constitutional requirements. Formulas of respect for constitutional safeguards cannot prevail over the facts of life which contradict them. They may not become a cloak for inquisitorial practices and make an empty form of the due process of law for which free men fought and died to obtain.
[Haley, supra, 332 U.S. at 601, 68 S.Ct. at 304, 92 L.Ed. at 229.]
When A.S. later stated that she did not understand the role of an attorney, Ramos and F.D. responded in a manner that was unlikely to be understood by A.S., stating only that an attorney would protect her "rights" and would keep Ramos from asking improper questions. The statements of both Ramos and F.D. provided the clear impression that, regardless of an attorney's presence, A.S. would be required to confess. Neither informed A.S. that an attorney would advise her on matters such as the consequence of her confession and the advisability of waiving her right against self-incrimination.[9] The *1070 testimony of A.S. at the suppression hearing confirmed her incomplete understanding of an attorney's role, thereby suggesting that her waiver of such assistance was not entirely knowing.
As we have already emphasized, to be valid, any waiver by A.S. was required to be voluntary, knowing and intelligent. As the United States Supreme Court has explained:
The inquiry has two distinct dimensions. First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.
[Moran v. Burbine, 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410, 421 (1986) (citations omitted).]
A.S.'s waiver in this case does not meet these exacting standards.
A further issue arises with respect to the right to remain silent. And here, the poor quality of the videotape becomes an issue, because it is not possible to determine with any accuracy the content of many of A.S.'s mumbled responses. It does not appear that A.S. ever directly requested that questioning cease  and Ramos testified that he would have complied with nothing less. However, A.S.'s statement that she did not know whether she wished to speak to Ramos, her evident reluctance thereafter to speak, and the long silences occurring before she offered any response, however minimal, suggests at least an equivocal invocation of the right to silence, warranting further inquiry by Ramos as to A.S.'s intent, not continued interrogation. See Miranda v. Arizona, 384 U.S. 436, 473-74, 86 S.Ct. 1602, 1627-28, 16 L.Ed.2d 694, 723 (1966) ("If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.") (emphasis supplied). "[A] valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained." Id. at 475, 86 S.Ct. at 1628, 16 L.Ed.2d at 724.
As the United States Supreme Court recognized in Michigan v. Mosley when discussing Miranda's requirement that the right to remain silent must be "scrupulously honored," Miranda, supra, 384 U.S. at 479, 86 S.Ct. at 1630, 16 L.Ed.2d at 726:
The critical safeguard identified in the passage at issue is a person's "right to cut off questioning." Through the exercise of his option to terminate questioning he can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation. The requirement that law enforcement authorities must respect a person's exercise of that option counteracts the coercive pressures of the custodial setting.
[Michigan v. Mosley, 423 U.S. 96, 103-04, 96 S.Ct. 321, 326, 46 L.Ed.2d 313, 321 (1975) (citation omitted).]
See also State v. Bey, 112 N.J. 45, 65, 548 A.2d 846 (1988) (Bey I) (holding that a request to terminate an interrogation must be honored "however ambiguous" it is and citing precedent supporting that conclusion); State v. Kennedy, 97 N.J. 278, 288, 478 A.2d 723 (1984); Bobo v. Kolb, 969 *1071 F.2d 391, 396 (7th Cir.1992) (reciting precedent discussing ambiguous assertion of the right to silence); Jacobs v. Singletary, 952 F.2d 1282, 1291-92 (11th Cir.1992) (same). As the Bey I Court held:
Even if defendant's conduct and remarks are treated as equivocal, and the police reasonably were unsure of defendant's wishes, their subsequent exchanges with him would have been narrowly restricted to clarifying the meaning of his statements.
[Bey I, supra, 112 N.J. at 65 n. 10, 548 A.2d 846.]
Ramos did not follow this precept, failing to clarify in any way A.S.'s statement that she did not know whether she wished to speak to him and failing to ascertain the foundation for A.S.'s evident reluctance thereafter to respond to his questions.
We also find it significant that Ramos misleadingly stated to A.S. that "the truth is only gonna help you," implying that A.S.'s truthfulness would be favorably evaluated by the assistant prosecutor in making a decision as to what to do with A.S.'s case. As Ramos stated, "the more truthful you are and more complete you are, okay, the better it looks for you, okay." Courts have found such tactics to be improper. Woods v. Clusen, 794 F.2d 293, 295, 297 (7th Cir.1986) (officer's "statement to the juvenile that it would `be better' if [he] talked was dubious advice to the ignorant, as any minimally competent defense counsel would be quick to attest."); Hart v. Atty. General for the State of Fla., 323 F.3d 884, 894 (11th Cir.2003) (telling a suspect that "honesty wouldn't hurt him" contradicted Miranda's warning that anything he said could be used against him in a court of law.).
We find of greatest significance in evaluating the totality of the circumstances presented in this case the evident conflict of interest experienced by F.D. in advising A.S., occurring as the result of her close relationship to the victim, C.J., her grandson. Because the proper treatment of such conflicts has not been addressed in New Jersey, we invited the Attorney General and the Acting Child Advocate to appear as amici in this matter, which they did, submitting briefs that have considerably illuminated the issues presented by this appeal and precedent relevant to them.
Our review of the record in this matter satisfies us that a conflict of interest on the part of F.D. was in fact present and manifest, and that throughout the interrogation, F.D. acted in the best interests of her grandson, not her adopted daughter. We find any conclusion by the Family Part judge to the contrary not to have been supported by the evidence. State v. Locurto, 157 N.J. 463, 470-71, 724 A.2d 234 (1999) (requiring the existence of substantial evidence in support of a trial judge's factual findings).[10]
In this regard, we recognize that in Q.N., a case involving the sexual assault upon three girls by a twelve-year-old nonrelative, the Court found that the State had carried its burden of demonstrating the juvenile's confession to be admissible, while observing:
This strikes us, however, as an atypical case in view of the fact that Q.N.'s mother twice urged her son to confess to the suspected acts, which ultimately he did. "[A] suspect is always free to waive the privilege [against self-incrimination] and confess to committing crimes, [so long as] that waiver [is not] the product *1072 of police coercion." [Presha, supra, 163 N.J.] at 313, 748 A.2d 1108. From that perspective, R.N.'s urgings were consistent with her right as a parent to so advise her son.
[Q.N., supra, 179 N.J. at 177, 843 A.2d 1140.]
The decision reflects that Q.N.'s mother had told her son, in the police's presence, "I know you did this. Please answer the officer's questions" and "I can tell by the way you're acting that you did this, answer the officer's questions." Id. at 169, 843 A.2d 1140. But in the present matter, F.D. went further than the mother of Q.N. First, she confirmed to Ramos A.S.'s guilt, which in fact was not a speculative conclusion, as in Q.N., but known to her as the result of A.S.'s confession to the family. And, second, she actively participated in the questioning of A.S., not only urging her to speak, but also at one point taking over Ramos's role as interrogator. As A.S. testified at the suppression hearing: "When I would remain silent they kept asking me the same questions over and over again...." (emphasis supplied).
While urging a juvenile to tell the truth, and even expressing an opinion as to guilt may be of benefit to the juvenile from the perspective of rehabilitation, F.D.'s open acknowledgement of A.S.'s guilt and her active participation in A.S.'s interrogation removed entirely the buffer F.D.'s presence was designed to provide between A.S. and the police, and cannot be deemed in this context to have been in the child's interest.[11]See Presha, supra, 163 N.J. at 314-15, 748 A.2d 1108; In re J.F., 286 N.J.Super. 89, 100, 668 A.2d 426 (App.Div. 1995); see also Haley, supra, 332 U.S. at 599-600, 68 S.Ct. at 303-04, 92 L.Ed. at 228-29 ("A 15-year-old lad ... needs someone on whom to lean lest the overpowering presence of the law, as he knows it, crush him ... to see to it [the police] stopped short of the point where he became the victim of coercion.").
In the circumstances presented, F.D.'s conflict in many respects rendered her assistance absent  a "highly significant factor" under Presha's standards for judging voluntariness. 163 N.J. at 315, 748 A.2d 1108. Moreover, her uncorrected legal misstatement that A.S. would have to talk eventually and her participation in A.S.'s interrogation rendered the process substantially unfair. S.H., supra, 61 N.J. at 115, 293 A.2d 181 (requiring in the absence of a knowing and intelligent waiver of rights that any questioning be "conducted with the utmost fairness and in accordance with the highest standards of due process and fundamental fairness.").
The significant impact of a parental conflict of interest was recognized by Justices Marshall and Brennan, dissenting in the denial of certiorari in the matter of Little v. Arkansas, 435 U.S. 957, 98 S.Ct. 1590, 55 L.Ed.2d 809 (1978). In that case, a thirteen-year-old girl of "low dull normal" intelligence confessed to the murder of her father after a ten or fifteen minute conference with her mother, who believed that she herself was a suspect. In an opinion written by Justice Marshall, the Justice stated he would have granted the writ "to resolve the question whether, before a juvenile waives her constitutional rights to remain silent and consult with an attorney, she is entitled to competent advice from an adult who does not have significant conflicts of interest." Ibid. In this regard, the Justice noted the Court's prior recognition of the special problems associated *1073 with the waiver of rights by juveniles and its requirement that the child receive advice from a "competent" adult before making a confession. 435 U.S. at 959, 98 S.Ct. at 1592, 55 L.Ed.2d at 810. The Justice further relied upon lower court decisions and commentary declining to find a juvenile's waiver to be valid when there was no showing that the parent was free from conflicts of interest and was competent to advise the child. Similarly, in Little, the Justice observed that the mother "was plainly not in a position to provide rational advice with only the child's interests in mind, especially on the day of the murder." Id. at 959, 98 S.Ct. at 1592, 55 L.Ed.2d at 810. In conclusion, Justice Marshall stated:
Under all of the circumstances, petitioner's contention that there was no valid waiver of her rights deserves this Court's plenary consideration. At the time that she made the decision to confess, the girl of "low dull normal" intelligence was not old enough, according to state law, to make decisions for herself on such other matters as marriage, voting, drinking alcoholic beverages, entering into an enforceable contract, initiating a lawsuit, and remaining in school. Her mother was hardly in a position to act on petitioner's behalf on the day of the confession, as discussed above. In view of our reaffirmation only last Term that courts must "indulge in every reasonable presumption against waiver," Brewer v. Williams, 430 U.S. 387, 404, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), I would grant the petition for certiorari.
[435 U.S. at 961, 98 S.Ct. at 1593, 55 L.Ed.2d at 811.][12]
We review the totality of the circumstances presented in this case against this background and conclude that the State has failed to meet its burden of demonstrating beyond a reasonable doubt that A.S.'s confession was knowingly, intelligently and voluntarily given. State v. Yough, 49 N.J. 587, 602, 231 A.2d 598 (1967). Therefore, it should have been suppressed.
In reaching this conclusion, we are mindful of A.S.'s youth, her relatively low intelligence, and her unfamiliarity with the criminal justice system. We also note the cursory nature of the administration of A.S.'s rights, the lack of meaningful consultation, the inadequacy of the explanation given to her regarding the role of an attorney in protecting her rights, and the significant possibility that she ambiguously invoked her right to remain silent. But of overwhelming significance to us is F.D.'s patent conflict of interest in advising A.S., arising from her relationship to the victim, her grandson C.J., and her evident determination to protect the interests of C.J. at the expense of those of A.S. Indeed, in the absence of the other enumerated factors, we would still be inclined to find suppression warranted in this matter. Cf. State v. Lasane, 371 N.J.Super. 151, 166, 852 A.2d 246 (App.Div.2004) (permitting withdrawal of guilty plea by juvenile following evidence that juvenile's mother had a sexual relationship with the juvenile's attorney and observing that "there is special significance to the need for parental support in these circumstances," which the court implied was lacking), certif. denied, 182 N.J. 628, 868 A.2d 1031 (2005). See also In the Matter of: Steven William T. 201 W.Va. 654, 499 S.E.2d 876 (1997) (finding *1074 juvenile's confession to murder to be invalid, in part, because the juvenile had been pressured to confess by a person in a lesbian relationship with the other murder suspect, the juvenile's foster mother, and finding the child's natural mother an inadequate advisor as the result of her lack of contact with the juvenile); State v. Neher, 969 So.2d 1252 (La.2007) (in granting certiorari, Justice concluded that the statement given by a sixteen-year-old juvenile should have been suppressed when he was advised by a supervisor in child protection services whose employment in law enforcement created a conflict of interest); In re Manuel R., 207 Conn. 725, 543 A.2d 719 (1988) (vacating disposition occurring after juvenile's waiver of counsel when waiver was urged by mother who did not want the child to be returned home).[13]
In circumstances such as those existing in the present matter, where the adult advisor is known to have a close family relationship to both the victim and the alleged perpetrator, the prudent approach would be to require the presence of an attorney capable of advising the juvenile with respect to her rights and her potential culpability, a procedure adopted elsewhere. 42 Pa. Cons.Stat. § 6337 (2009); Ariz.Rev.Stat. § 8-221(E) (2008).

III.
In his decision in this matter, the Family Part judge reiterated his determination that the statement given by A.S. to Ramos was admissible. However, he then stated:
In this case I wish to be very, very clear. I am convinced of the appropriateness of the ruling with respect to [A.S.'s] statement and am not attempting to back off of that. But I want to be clear as the trier of fact[] [t]hat if that statement was not received in evidence, if my decision was to strike it, there is more than adequate evidence from [C.J.] himself today in his testimony and in the statement that he made to his mother and to Detective Rabii two days after the incident that would cause this court to conclude beyond a reasonable doubt that [A.S.] is guilty of this offense as charged.
Her statement supports that but it is not necessary for me on this record to have that statement in, in order to conclude beyond a reasonable doubt that she did commit the ... aggravated sexual assault by sexual penetration.
The judge further found that the testimony given by C.J. was credible, trustworthy and reliable, that no motive to lie had been introduced, and that the boy's testimony was sufficient to sustain an adjudication of delinquency with respect to the offense charged.
We find the judge's factual determinations in this regard to have adequate support in the record, and we therefore sustain them. Locurto, supra, 157 N.J. at 470-71, 724 A.2d 234. We remain troubled that by affirming the trial judge on this alternative ground, our determination to suppress the confession given by A.S. has no prophylactic effect. We are further troubled by the application of Megan's law to this fourteen-year-old girl who, it appears fair to conclude, is not a sexual *1075 deviant, but rather an immature teen who engaged in an unfortunate sexual experiment. Nonetheless, we find the trial judge's conclusions to be legally and factually unassailable. For that reason, and despite our conclusion with respect to the confession given by A.S., we affirm the adjudication.
Affirmed.
NOTES
[1] The record suggests that A.S. was adopted approximately one year before the incident at issue.
[2] Our description is derived from the partial transcript made by the State from the videotape and from our review of the videotape itself. The transcript was not admitted in evidence at trial because of inaccuracies found in it. We have sought to correct those inaccuracies to the extent possible.
[3] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[4] Amicus, the Office of the Child Advocate, argues that A.S. responded "I don't want," and utilizes that interpretation as a basis for an argument that A.S. invoked her right to silence. We have reviewed the tape and concur with the State's position that A.S. said "know," not "want."
[5] Her predisposition report indicates that A.S. had a "low-average" I.Q. of 83.
[6] The judge sustained the State's objection to this argument stating that it didn't relate to November 27, but rather to the present.
[7] As a matter of law, the confession of a juvenile under the age of fourteen is inadmissible if not given in the presence of parent or legal guardian unless such person is "truly unavailable." Presha, supra, 163 N.J. at 308, 748 A.2d 1108.
[8] There has been considerable scholarly recognition of the lack of understanding possessed by juveniles with respect to their Miranda rights and the consequences of exercising them. See, e.g., Thomas Grisso, Adolescents' Decision Making: A Developmental Perspective on Constitutional Provisions in Delinquency Cases, 32 New England J. on Crim. & Civ. Confinement, 3, 10-11 (2006); Kimberly Larson, Note, Improving the "Kangaroo Courts": a Proposal for Reform in Evaluating Juveniles' Waiver of Miranda, 48 Vill. L.Rev. 629, 649-53 (2003).
[9] We recognize that a parent is not required to act as an attorney in advising a juvenile on the subject of waiver. Presha, supra, 163 N.J. at 319, 748 A.2d 1108 ("A parent obviously enjoys a special relationship with the juvenile; however, the attorney, not the parent, is trained in the law and serves in a unique role as the juvenile's advocate."). However, we find no precedent that suggests that a parent or law enforcement, as appropriate, is excused from properly explaining what an attorney could do on a child's behalf.
[10] The refusal of F.D. to permit A.S. to return to her home and her attempts to revoke the adoption, facts known to the Family Part judge, further confirm the existence of a conflict of interest on F.D.'s part in her interactions with A.S.
[11] See discussion of failure of parents to act in their child's best interest in Larson, supra, 48 Vill. L.Rev. at 653-59.
[12] The subject of parental conflicts of interest in this context has been addressed in articles such as Hillary B. Farber, The Role of the Parent/Guardian in Juvenile Custodial Interrogations: Friend or Foe?, 41 Am.Crim. L.Rev. 1277 (2004) and Andy Clark, "Interested Adults" with Conflicts of Interest at Juvenile Interrogations; Applying the Close Relationship Standard of Emotional Distress, 68 U. Chi. L.Rev. 903 (2001).
[13] But see Commonwealth v. McCra, 427 Mass. 564, 694 N.E.2d 849 (1998), requiring evidence of actual antagonism before finding a confession to be inadmissible. Similarly, see Commonwealth v. Philip S., 414 Mass. 804, 611 N.E.2d 226, 231 (1993); commonwealth v. Alfonzo A., 438 Mass. 372, 780 N.E.2d 1244, 1253 (2003). The Massachusetts approach has been criticized. See Farber, supra, 41 Am.Crim. L.Rev. at 1289.