999 A.2d 1136 (2010)
203 N.J. 131
STATE of New Jersey in the Interest of A.S.
A-58/59 September Term 2009.
Supreme Court of New Jersey.
Argued April 27, 2010.
Decided July 29, 2010.
*1137 Leslie-Ann M. Justus, Deputy Attorney General, argued the cause for appellant (Paula T. Dow, Attorney General, attorney; Ms. Justus, of counsel; Ms. Justus *1138 and Paul A. Heinzel, Deputy Attorney General, on the briefs).
Jay L. Wilensky, Assistant Deputy Public Defender, argued the cause for respondent (Yvonne Smith Segars, Public Defender, attorney).
Joseph F. Suozzo, First Assistant Child Advocate, submitted a brief amicus curiae on behalf of the Office of the Child Advocate of New Jersey.
Justice LaVECCHIA delivered the opinion of the Court.
A.S., a fourteen year old with an I.Q. of 83 and who could read only at a third-grade level, was adjudicated delinquent for conduct that, if committed by an adult, would constitute first-degree aggravated sexual assault. On appeal, she challenged the circumstances under which she was provided her constitutional warnings and then was subjected to police interrogation. The Appellate Division found that although A.S.'s adoptive mother was present for the interrogation, the mother's presence did not provide any buffer of protection and assistance to A.S. in the exercise of the juvenile's rights due to the mother's conflicted interest and concern for the victim, her four-year-old biological grandson. The Appellate Division nevertheless held that the admission of A.S.'s confession was harmless due to the trial court's statements about the quantum of other evidence in the record. However, the panel expressed the view that, in the future, when such conflicts of interest occur due to close family relationships among juvenile-offense suspects and victims, legal counsel should be brought in for the juvenile. Based on that pronouncement, the State petitioned for certification, which we granted, and A.S. cross-petitioned, which we also granted.
We hold that that A.S.'s confession was secured under circumstances that, in their totality, rendered her statement involuntary. In State v. Presha, 163 N.J. 304, 315, 748 A.2d 1108 (2000), we said that a parent should be present, if at all possible, during the interrogation of a juvenile and, further, we said that that presence would be considered a significant factor in an assessment of the totality of the circumstances when determining the voluntariness of a child's confession. We agree with the Appellate Division that A.S.'s confession cannot be safely regarded as a voluntary waiver of her constitutional rights. The police placed A.S.'s mother in the role of their helper from the outset of the interrogation process by making her read the child her rights. The police also failed to correct the mother's later misstatements about those rights, and failed to stop the inquiry when A.S. was making imperfect, child-like efforts to assert her right to silence that were overcome by her mother's badgering of her in the police presence. Under a totality of circumstances analysis, a confession secured by such means must be suppressed. However, with that shared finding we part company with the Appellate Division.
Although the trial court stated that the evidence was sufficient to sustain the delinquency adjudication with or without consideration of A.S.'s statement, the nature of the constitutional deprivation herewhere the adult present to protect the juvenile became a de facto agent of the policedemands a prophylactic remedy. In the limited circumstances presented, there must be a new delinquency hearing, before another judge who will not have been exposed to the tainted statement by A.S. Only by resort to that less-than-desirable remedy can we be assured that the State does not benefit from the inappropriate police practice followed in this matter. We also reject the practice of having a child's parent be responsible for reading to the child his or her constitutional warnings. *1139 That practice set A.S.'s interrogation down a wrong and problematic path one that was exacerbated by her mother's aggressive interactions with her. Our purpose in establishing in Presha a preference for parental presence for a child facing questioning by police was to assist the child in the exercise of his or her constitutional rights; it was not to provide the police with an assistant.
That said, we see no need to embrace the bright-line, and broad, new legal representation requirement proposed by the appellate panel below. It does not appear practical or necessary always to replace parents with legal counsel in a particular category of circumstances. Rather, we caution police interrogators to use common sense, to remember their duty to ensure that a child being interrogated understands his or her right to terminate an interrogation by exercise of the right to silence and, further, to adhere to the duty to scrupulously enforce that right, even when exercised imperfectly, as a child, understandably, might express such a desire.

I.

A.
A.S. was the adoptive daughter of F.D.[1] A.S. and F.D. lived in one-half of a duplex; the other half was inhabited by F.D.'s daughter T.B., and T.B.'s four-year-old son C.J., who was F.D.'s grandson. While A.S. was home with C.J. on the night of November 25, 2007, she allegedly performed fellatio on the boy for a period of approximately ten minutes. Although A.S. told C.J. not to tell anyone about the incident, after his bath the next night around midnight, C.J. told his mother that A.S. was "kissing on my balls and sucking on my tinky."
T.B. had her mother, F.D., come over and T.B. repeated what she heard had happened the previous day. F.D. confronted A.S., who became upset, denied the allegations, and claimed that C.J. had been saying similar things earlier that day and that he had learned it from someone in school. F.D. accused A.S. of lying and said, "I don't believe you. You need to tell the truth." F.D. grew so angry with A.S. that T.B. felt the need to have a friend present to ensure that there was not an altercation between F.D. and A.S. Later that night, T.B. contacted the police and at some point during the following day, while still at home, A.S. apparently confessed to the act in the presence of T.B. and F.D., stating that she did not know why she did it.
That day, C.J. and A.S. were interviewed by detectives at the Somerset County Prosecutor's Office. A detective interviewed A.S., with F.D. present. Although the interview was videotaped, a transcript or verbatim record of the tape was not admitted into evidence at trial; however, the actual VHS cassettes were introduced into evidence.[2] Thus, our recitation of the interview is based on our own transcription of the videotapes, but we must acknowledge that the poor quality of the tapes complicates that task.
At the outset of the interview the detective requested that F.D. read to A.S. her Miranda[3] rights. F.D. read the Miranda *1140 form in its entirety, without any clarification, and asked A.S. if she understood her rights. A.S. nodded and said "umm hmm." That entire exchange took less than one minute. F.D. then read aloud the portion of the form dealing with her rights as a parent, calling it "double-talk" and a "two-folded question" because of the way that it was worded.[4] The detective attempted to clarify F.D.'s rights as a parent, and blamed her confusion on the fact that the form was written by a lawyer. That exchange took almost three minutes. At that point, the following conversation occurred:
F.D.: So what do you want to do?
A.S.: Hmm.
F.D.: Do you want to talk to the police or you don't want to talk to them?
A.S.: Um. I don't know.
F.D.: Hmm?
A.S.: I don't know.
F.D.: You are going to have to answer. This is what the papers are for. He wants to know are you going to talk to him or are you not going to talk to him.
Detective: (Inaudible).
F.D.: Do you want a lawyer?
A.S.: Mmmmmm. What does a lawyer do?
F.D.: Supposed to represent you.
A.S.: Mmhmm.
F.D.: Well, what do you want? Hmm?
A.S.: Hmm?
F.D.: What do you want? Hmm?
A.S.: If I have a lawyer I don't have to talk? Or I do have to talk?
F.D.: Well at some point in time, you going to have to talk. You ain't been sayin' nothing anyway. And you ain't gonna do nothing but lie to him anyway. We already know you did it, what you did. You didn't give him any rights. You can question her but I want to be present. You can question her.
Shortly thereafter, the discussion continued:
Detective: Now we're going to have to be, cause she, uh, she was unclear whether she wanted an attorney present or not. So I just need to be very clear on that.
F.D.: I'm surprised DYFS didn't have one here for her.
Detective: (Inaudible). Okay, [A.S.], you read, you know, uh, your mom read your rights to you, and everything else. Okay, she explained them to you?
A.S.: Mmhmm.
Detective: You expressed some concern about, about the attorney portion, the lawyer portion, okay? Is there something that you, that you don't understand that you want us to explain to you, um, about the way that this is explained?
A.S.: Mmmhmm.
Detective: Okay, what is your question, maybe I can explain it to you?
A.S.: Ummm. No, you don't have to.
Detective: Do you want to have an attorney present while I'm asking questions?
A.S.: What would an attorney do?
Detective: Well, an attorney would represent you.
A.S.: So it would talk for me?
Detective: Mmm. No, no.
A.S.: Then what would it do?

*1141 Detective: Well what he would do is he would represent you legally. At some point
F.D.: They're going to make sure your rights are not violated.
Detective:violated.
F.D.: That means that he's not asking you something that you shouldn't be answering. That's why he's asking you if you want an attorney. The attorney can't speak for you. He can represent you. But when the questions are asked you have to answer the question.
Detective: The attorney, like your, like your mom said, the attorney is there to make sure your rights aren't violated, um, that, that I'm, you know, advise you of what your rights are, that you're being advised, um, but he can't, you know you're the only one that can actually speak the truth here. So he's not going to speak for you.
F.D.: Tsk. Go ahead and ask her the questions. You'll be sitting here all day long, and she'll be sitting here just like that.
Detective: Okay. Well.
F.D.: And you better hope she answers some of them questions, `cause she may sit there just like that.
Detective: One of the things that I'm going to ask you, okay, you know, I have, I have a few rules, okay. Um. The biggest rule that I do observe is that if I ask a question I expect the truth, okay? Um. The truth is only going to help you, okay. Um. I don't want to sit here and continually go over the same thing and get different answers, okay? Um. It doesn't look good for you, okay. If you, if you are truthful, obviously, there's some, there's an attorney that's an assistant prosecutor that's going to review all this information, okay?
A.S.: Mmm.
Detective: And when they review it if you're, you know, if you're lying, or you're not telling the truth, or you're not telling the whole truth and you're leaving stuff out, um, you know, that doesn't look, doesn't look good for you, okay? The more truthful you are and the more complete you are, okay, the better it looks for you, okay? It shows, it shows that, you know, that you're a good person, okay?
The detective and F.D. then pressed A.S. to tell them what had happened, leading to this exchange:
Detective: Well you got to tell us what, what it was that happened. I mean, we can't, we can't help you if you don't help us, okay?
F.D.: Tell him what happened [A.S.]. Don't be embarrassed, he already knows. See he already done talk to [C.J.], so you might as well just go ahead and tell him.
Detective: This is not the first time I'm hearing something like this, so if you're worried about being embarrassed, don't be.
F.D.: If she was so embarrassed she would've never done what she did in the first place. Tell him what you did
[A.S.]. We cannot sit here all day long for you to stare at the man, tell him what happened.
....
F.D.: [A.S.], we're not gonna be here all day and all night. Tell the man. He already knows what you did.
A.S.: Why, I don't want to.
F.D.: Because you have to tell him what you did.
A.S.: (Inaudible).
F.D.: Tell him what you did.
And then, later, F.D. and the detective continued:
F.D.: Did you hear him ask you a question? Answer it. Answer the question. *1142 Did you hear him? Answer the question.
Detective: You're being quiet. It not gonna, you know, it's not like I'm gonna get all the answers in my head. It doesn't work that way.
Eventually, more than thirty minutes into the interview, A.S. confessed that she had "sucked [C.J.'s] tinky" for ten minutes and then went to sleep. After A.S. confessed, the interview continued for thirty more minutes, with the detective questioning A.S. about why she performed fellatio on C.J., where she learned about fellatio, and inquiring into her sexual history. F.D. interjected and asked A.S. questions throughout, chastising her several times. F.D. also referenced C.J. and asked A.S. why she would do this to him because he was just a baby. At one point, when the detective left the room, F.D. said to A.S., "You are such a liar. You are such a liar. You can't be trusted. You can't be trusted."
Throughout the interview, the questions addressed to A.S. were greeted with long periods of silence on her part, some lasting over a minute. In fact, during the first thirty minutes of the interview, thirteen minutes consisted of A.S. remaining silent after she was asked a question either by the detective or F.D. As the detective himself put it later in the interview, "[we] can't do this all night. I asked you a question. Have to wait ten fifteen minutes for you to give an answer. In forty-five minutes you gave me four answers, okay."

B.
Defense counsel filed a motion to suppress the videotaped interview, and that motion was argued as part of A.S.'s delinquency adjudication. Counsel contended that A.S.'s confession should be suppressed because A.S. understood neither her right to remain silent nor her right to an attorney and that her confession was not freely and voluntarily given. Counsel also argued that F.D. had acted as an interrogator and had unduly pressured A.S. to confess, abdicating her responsibility as a parent to A.S. and instead advancing the interests of her grandson.
A.S. testified during the suppression hearing portion of her delinquency adjudication. She acknowledged that she was not yelled at or threatened during the interview and that she was not tired at the time. She also stated that although she was in ninth grade, she only read at a third-grade level. On direct examination, the following exchange took place:
Q: Now, you were present when this Miranda paper was signed, correct?
A: Yes.
Q: Did you understand it?
A: Some of it.
Q: Did you understand what an attorney was?
A: No. I had asked.
Q: Andexplain to us what you found out and how you understood?
A: They told me thatthat a lawyer orwhat is it calledattorney. They just make sure your rights aren't get violated or something like that.
Q: And what did that mean to you?
A: I thought they justthey just make sure when people are questioning you that they don't ask you something that is not supposed to be asked or something. I didn't know that they do what you do.
Q: What about the right to remain silent? What did you understand that to mean?
A: That if I didn't want to say anything I didn't have to talk.
Q: And is that what you did?
A: Yeah. But I still got asked a question and stuff.

*1143 Q: Did you feel pressured to answer?
A: Yeah.
Q: Did youdo you consider what you said to be voluntary?
A: What do you mean by that?
Q: Did you want to say what you said or did you
A: No, I didn't want to answer.
During cross-examination A.S. further expounded that the reason that she did not request an attorney was because, "when I asked what an attorney was, what they had told me, I felt as though there was no reason because they didn't do anything. They just sat there." When she was asked again about her understanding of her right to an attorney, A.S.'s answer related back to her conception of her right to remain silent in the following fashion:
[T]hat kind of goes back to the first one where it says I have a right to remain silent. When I would remain silent they kept on asking me the same questions over and over again for me to answer. They never said that I had to say, no, I don't want to talk no more. It says remained silent and that's what I had did.
That point was refined by further questioning on redirect-examination:
Q: Can you explain for us againwhat you thought the right to remain silent means?
A: I thought what it said was that if I didn't want to answer the question, I didn't have to say anything.
Q: Did you know that you had to do anything other than not answer?
A: No. They did not tell me I had to say no, to remain silent, so that's what I did.
Q: And did your mother ever ask you why you weren't answering?
A: No.
Q: Did the detective ask you?
A: No.
Q: Did you feelwhat did you think would happen if you didn't answer?
A: I don't know what would happen so that's why after a while they kept asking me, I finally just answered some of them. Because I didn't really know what would happen or what wouldn't happen.
Q: Were you worried something bad might happen?
A: Yeah.
Q: But you didn't know what?
A: No.
The juvenile court denied the motion to suppress the videotaped interview. The court characterized, with understatement, the procedure by which the Miranda warnings were given as "a little unusual" and "probably not the best police practice." Nonetheless, the court was satisfied that A.S. was read and understood her rights. Although the court accepted that A.S. read at a third-grade level, the court also found there were no impairments to her comprehension and intelligence. The court characterized the responses that the detective and F.D. gave to A.S. when she asked what lawyers do as "quite good," "not misleading," and "under the circumstances certainly adequate." The court also believed that even though F.D. was clearly angry, she did not coerce A.S.
The court then found that A.S. had committed an act that, if performed by an adult, would constitute first-degree aggravated sexual assault, contrary to N.J.S.A. 2C:14-2(a)(1), and adjudicated her delinquent. The court noted the following:
In this case I wish to be very, very clear. I am convinced of the appropriateness of the ruling with respect to [A.S.'s] statement and am not attempting to back off of that. But I want to be clear as the trier of fact. That if that statement was not received in evidence, *1144 if my decision was to strike it, there is more than adequate evidence from [C.J.] himself today in his testimony and in the statement that he made to his mother and to [the detective] two days after the incident that would cause this court to conclude beyond a reasonable doubt that [A.S.] is guilty of this offense as charged.
The court also found that A.S. did not commit the act because she was curious, but rather for her own sexual gratification. That finding was based on the fact that A.S. admitted during the videotaped interview that she previously had been sexually active, although she said that she had never before engaged in fellatio. A.S. was subsequently committed to the Juvenile Justice Commission for one year, but that disposition was suspended conditioned on her completion of sex offender treatment at the Haven Home Program and two years of probation. She was also required to register as a sex offender pursuant to Megan's Law, N.J.S.A. 2C:7-1 to-23.
A.S. appealed and a "troubled" Appellate Division affirmed. State ex rel. A.S., 409 N.J.Super. 99, 123, 975 A.2d 1060 (App.Div.2009). The Appellate Division applied the totality of the circumstances test that we annunciated in Presha, and determined that "the State has failed to meet its burden of demonstrating beyond a reasonable doubt that A.S.'s confession was knowingly, intelligently and voluntarily given." Id. at 121, 975 A.2d 1060 (citation omitted). The Appellate Division found that A.S. did not understand her Miranda rights and that the efforts made to help her understand those rights were not only ineffectual, but actually misinformed her. Id. at 115-18, 975 A.2d 1060. Additionally, the Appellate Division was concerned by F.D.'s conflict of interest because of her relationship to both A.S. and the victim, her grandson C.J., characterizing F.D.'s role not as a parent, but rather as an "interrogator." Id. at 119, 975 A.2d 1060. In order to avoid such problems in future cases in which the parental figure has a close relationship with both the victim and the accused, the Appellate Division posited that "the prudent approach would be to require the presence of an attorney capable of advising the juvenile with respect to her rights and her potential culpability, a procedure adopted elsewhere." Id. at 122-23, 975 A.2d 1060. Despite those concerns, the Appellate Division affirmed A.S.'s delinquency adjudication based on the other evidence in the record in light of the trial court's statement that A.S.'s confession was not absolutely necessary to its ruling. Id. at 123, 975 A.2d 1060.
Both parties appealed and we granted the State's petition for certification, State ex rel. A.S., 200 N.J. 549, 985 A.2d 647 (2009), and A.S.'s cross-petition for certification, id. at 550, 985 A.2d 647. We also granted the Attorney General of New Jersey and the Office of the Child Advocate of New Jersey status to appear as amici curiae.
The parties reiterate the arguments that they raised in the Appellate Division. In addition, the parties include arguments addressing the Appellate Division's conclusion that attorneys should be provided to juveniles in cases in which the parent has a close relationship to both the suspect and the victim. The State and the Attorney General contend that such a requirement is contrary to our case law and intrudes on a parent's right to raise his or her child. A.S. responds by noting that her constitutional rights cannot be subsumed by the rights of her adoptive mother. The Office of the Child Advocate agrees with the Appellate Division that counsel should be provided to a juvenile when the parent has a conflict of interest.

*1145 II.
We begin, as did the Appellate Division, with the decision in Presha, our seminal case addressing the admissibility of juvenile confessions. In Presha, we reaffirmed that "[t]he privilege against self-incrimination, as set forth in the Fifth Amendment to the United States Constitution, is one of the most important protections of the criminal law," Presha, supra, 163 N.J. at 312, 748 A.2d 1108 (citations omitted), and that that constitutional right carries the same force in the context of juvenile interrogations as its does for adult interrogations, id. at 313, 748 A.2d 1108 (citing N.J.S.A. 2A:4A-40). Thus, in order for a juvenile's confession to be admissible into evidence it must satisfy the same standard that applies to adult confessions: that is, it must be made knowingly, intelligently, and voluntarily. Id. at 313, 748 A.2d 1108. We look to the totality of the circumstances in making that determination, giving weight to "`the suspect's age, education and intelligence, advice as to constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature and whether physical punishment or mental exhaustion was involved,'" as well as the "`suspect's previous encounters with the law.'" Ibid. (quoting State v. Miller, 76 N.J. 392, 402, 388 A.2d 218 (1978)).
In Presha, we also noted the increased emphasis being placed on punishment as a rationale underlying the juvenile justice system, as opposed to its traditional rehabilitative purposes. Id. at 314, 748 A.2d 1108. In light of that paradigm shift, we recognized that "the parent's role in an interrogation setting takes on new significance." Id. at 314-15, 748 A.2d 1108. We therefore instructed courts to consider the parent's role as a "highly significant factor" in the totality of the circumstances analysis used to assess whether a juvenile's confession was knowing, intelligent, and voluntary.[5]Id. at 315, 748 A.2d 1108. We elaborated that
[b]y "highly significant factor" we mean that courts should give that factor added weight when balancing it against all other factors. By elevating the significance of the adult's role in the overall balance, we are satisfied that the rights of juveniles will be protected in a manner consistent with constitutional guarantees and modern realities.
[Ibid.]
It is not enough, however, to simply reiterate our holding in Presha that a parent's role is a "highly significant factor" in assessing the totality of the circumstances surrounding a juvenile's confession without also elaborating on the role that Presha envisioned the parent serving. In Presha, we explained that "[t]he role of a parent in the context of a juvenile interrogation takes on special significance," because "[i]n that circumstance, the parent serves as advisor to the juvenile, [and] someone who can offer a measure of support in the unfamiliar setting of the police station." Id. at 314, 748 A.2d 1108 (citing Gallegos v. Colorado, 370 U.S. 49, 54, 82 S.Ct. 1209, 1213, 8 L.Ed.2d 325, 329 (1962)). We further explained that
[w]hen younger offenders are in custody, the parent serves as a buffer between the juvenile, who is entitled to certain protections, and the police, whose investigative function brings the officers necessarily in conflict with the juvenile's *1146 legal interests. Parents are in a position to assist juveniles in understanding their rights, acting intelligently in waiving those rights, and otherwise remaining calm in the face of an interrogation.
[Id. at 315, 748 A.2d 1108 (citing Gallegos, supra, 370 U.S. at 54, 82 S.Ct. at 1212-13, 8 L.Ed.2d at 329).]
Moreover, the mere presence of a parent is insufficient to protect a juvenile's rights, because presence alone cannot be said to provide the buffer between police and the juvenile that we were contemplating in our decision in Presha. In order to serve as a buffer, the parent must be acting with the interests of the juvenile in mind. That is not to say that a parent cannot advise his or her child to cooperate with the police or even to confess to the crime if the parent believes that the child in fact committed the criminal act. See State ex rel. Q.N., 179 N.J. 165, 843 A.2d 1140 (2004) (finding that juvenile's confession was voluntary even though mother urged her son to confess and left interrogation room). Indeed, although in Q.N. we characterized the situation where a mother urged her son to confess as "atypical," we also recognized that the mother's "urgings were consistent with her right as a parent to so advise her son." Id. at 177, 843 A.2d 1140.

III.

A.
Applying that background law, we must now assess the totality of the circumstances surrounding A.S.'s confession to determine if it was made knowingly, intelligently, and voluntarily. As discussed, the factors relevant when making that determination include the child's age, education and intelligence, advice as to constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature and whether physical punishment or mental exhaustion was involved, prior experience with the legal system, and the "highly significant factor" of parental involvement. See Presha, supra, 163 N.J. at 313, 315, 748 A.2d 1108.
A.S. was fourteen years old at the time of the interrogation. That age put her on the cusp for heightened protections because a fourteen-year-old is still of tender sensibilities and may have great difficulty withstanding the rigors of a police interrogation. As the United States Supreme Court stated in a case involving a juvenile of the same age,
a 14-year-old boy, no matter how sophisticated, is unlikely to have any conception of what will confront him when he is made accessible only to the police. That is to say, we deal with a person who is not equal to the police in knowledge and understanding of the consequences of the questions and answers being recorded and who is unable to know how to protect his own interests or how to get the benefits of his constitutional rights.
... He cannot be compared with an adult in full possession of his senses and knowledgeable of the consequences of his admissions. He would have no way of knowing what the consequences of his confession were without advice as to his rightsfrom someone concerned with securing him those rightsand without the aid of more mature judgment as to the steps he should take in the predicament in which he found himself. A lawyer or an adult relative or friend could have given the petitioner the protection which his own immaturity could not. Adult advice would have put him on a less unequal footing with his interrogators. Without some adult protection against this inequality, a 14-year-old boy would not be able to know, let alone assert, such constitutional rights as he had.

*1147 [Gallegos, supra, 370 U.S. at 54, 82 S.Ct. at 1212-13, 8 L.Ed.2d at 328-29 (emphasis added).]
Furthermore, although A.S. was in ninth grade at school, she was not intellectually sophisticated. She read at a third-grade level and had a "low-average" I.Q. of 83. And, she had no prior experience with the legal system, so we cannot presume that she was "familiar with the criminal process at the time of [her] statement." Presha, supra, 163 N.J. at 317, 748 A.2d 1108.
In light of those facts, all of which suggest that a clear and easy-to-understand explanation would be necessary to meaningfully inform A.S. of her constitutional rights, the actual efforts employed to inform her of those rights were woefully inadequate. Indeed, the detective abdicated his responsibility in that regard by having F.D. read A.S. her rights, a procedure which tainted the interview from its outset and must not be utilized in the future. It is a police officer's responsibility to read and to make sure that the juvenile understands his or her constitutional rights before proceeding with an interrogation. That requirement comports with the special care that must be taken with respect to the child's constitutional rights. The parent is not present to assume the role and responsibility of the police, but rather to act as a "buffer" and "to assist juveniles in understanding their rights, acting intelligently in waiving those rights, and otherwise remaining calm in the face of an interrogation." Presha, supra, 163 N.J. at 315, 748 A.2d 1108 (citation omitted).
Here, in less than a minute's time, F.D. read the Miranda form to A.S.; there was no further explanation given to A.S. of her constitutional rights. In contrast, the explanation to F.D. of her rights as a parent was more in-depth and detailed. It was not until later, when the detective and F.D. wanted A.S. to tell them what happened, that they attempted to explain A.S.'s constitutional rights to her. At that time, when A.S. asked what an attorney would do, she was told that an attorney would represent her and protect her rights. While that explanation might be sufficient for an adult or someone with experience with the legal system, it was insufficient to enlighten a fourteen-year-old who was asking questions about her rights presumably because she did not understand them. Telling a juvenile who does not understand her rights that an attorney would "make sure your rights aren't violated" is an empty gesture.
Moreover, the attempts to inform A.S. of her rights contained actual misinformation. Although F.D. gave the most helpful explanation of what an attorney does when she told A.S. that an attorney would make sure the detective was "not asking you something that you shouldn't be answering," she followed that up by stating that "when the questions are asked you have to answer the question," which plainly contradicted A.S.'s right to remain silent. At other points during the interview, F.D. told A.S. that she must talkmust answerwhich implied that even if A.S. requested an attorney, she nevertheless would have to answer the questions. Efforts should have been made to correct those misstatements of the law to ensure that the fourteen-year-old being interrogated understood her constitutional rights. Later in the interview, after A.S. had started to answer questions but then became unresponsive, F.D. again instructed A.S. to tell the detective what she did. A.S. replied, "Why, I don't want to," but the detective and her mother persisted in questioning her. It is thus unsurprising that, at the suppression hearing, A.S. testified that she did not request an attorney because she was under the impression that an attorney "didn't do anything. They just sat there," and that she felt like her *1148 right to remain silent essentially was meaningless.
Finally, we note our agreement with the Appellate Division's observation that the detective should not have told A.S. that answering his questions would show that she was a "good person" and would actually benefit her. Not only was the veracity of such advice dubious, a fact of which an attorney would have made A.S. aware, it also contradicted the Miranda warning provided to A.S.: that anything she said in the interview could be used against her in a court of law. See State v. Pillar, 359 N.J.Super. 249, 268, 820 A.2d 1 (App.Div. 2003) ("A police officer cannot directly contradict, out of one side of his mouth, the Miranda warnings just given out of the other."); see also Hart v. Attorney Gen. of Fla., 323 F.3d 884, 894 (11th Cir.2003) ("Telling [the defendant] that `honesty wouldn't hurt him' contradicted the Miranda warning that anything he said could be used against him in court."); Woods v. Clusen, 794 F.2d 293, 297 (7th Cir.1986) ("[S]tatement to the juvenile that it would `be better' if Woods talked was dubious advice to the ignorant, as any minimally competent defense counsel would be quick to attest."); Quick v. State, 599 P.2d 712, 720 n. 12 (Alaska 1979) (distinguishing "between mere exhortations to tell the truth and promises of leniency or better treatment" (citations omitted)).
In the words of the United States Supreme Court, "the greatest care must be taken to assure that the [juvenile's] admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair." In re Gault, 387 U.S. 1, 55, 87 S.Ct. 1428, 1458, 18 L.Ed.2d 527, 561 (1967). An impartial review of the videotaped interview yields convincing evidence that the "greatest care" was not taken to protect A.S.'s constitutional rights in this case. The attempts by the detective and F.D. to inform A.S. of her constitutional rights were not only incomplete, but also incorrect. We have no confidence that A.S.'s confession was not "the product of ignorance of [her] rights." Ibid. We therefore conclude, upon consideration of the totality of the circumstances, that A.S.'s confession was not knowingly, intelligently, and voluntarily given.

B.
We also must determine whether the admission of A.S.'s confession into evidence was harmful: that is, whether it was "clearly capable of producing an unjust result." R. 2:10-2. The Appellate Division, although "troubled," affirmed A.S.'s delinquency adjudication in large part due to the juvenile court's assessment that even if the videotaped statement had not been introduced into evidence, the court still would have adjudicated A.S. delinquent. See A.S., supra, 409 N.J.Super. at 123, 975 A.2d 1060.
We are hesitant to assume that any human being, even an experienced, thoughtful, and able Family Part judge as the judge below undoubtedly was and iscan partition evidence and compartmentalize his or her decision-making so neatly, particularly when the evidence in issue is of such magnitude, the means by which the evidence was procured was so disturbing, and the judge has already rendered a determination on the ultimate question. See State v. Kern, 325 N.J.Super. 435, 444, 739 A.2d 969 (App.Div.1999) ("To dismiss a confession of guilt as `not critical in light of the other fact findings' is, we think, contrary to human nature."). We also share the following concerns raised by the Appellate Division:
We remain troubled that by affirming the trial judge on this alternative ground, our determination to suppress *1149 the confession given by A.S. has no prophylactic effect. We are further troubled by the application of Megan's [L]aw to this fourteen-year-old girl who, it appears fair to conclude, is not a sexual deviant, but rather an immature teen who engaged in an unfortunate sexual experiment.
[A.S., supra, 409 N.J.Super. at 123, 975 A.2d 1060.]
Those doubts and concerns are reinforced by our recognition that "certain constitutional errors so impugn the integrity of our system of justice that any doubts about their prejudice to the defendant must be resolved against the State, which seeks the benefits of its constitutional wrongdoing." State v. McCloskey, 90 N.J. 18, 30, 446 A.2d 1201 (1982). Indeed, in McCloskey the Court specifically cautioned against relying on the harmless error doctrine in cases in which a defendant's privilege against self-incrimination is violated, as was the case here. See id. at 30-31, 446 A.2d 1201.
The standard "for determining whether an error is harmless is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." State v. Sanchez, 129 N.J. 261, 278, 609 A.2d 400 (1992) (internal quotation marks and citations omitted). Here, the confession was by far the most damning piece of evidence against A.S., and thus we cannot say that there was no reasonable possibility that its introduction into evidence contributed to the delinquency adjudication. See McCloskey, supra, 90 N.J. at 31, 446 A.2d 1201 (noting that "the improper use of incriminating statements made by a criminal defendant has great potential for prejudice"). Indeed, it may have been the source of most of the record support for finding that there was an element of sexual gratification in this matter. We do not suggest that without the confession the State will be unable to prove its casethere may be sufficient evidence to obtain a delinquency adjudication on remandbut that is not the legal standard that governs this dispute. Here, there is a reasonable possibility that the improper admission of A.S.'s confession into evidence contributed to her delinquency adjudication, see Sanchez, supra, 129 N.J. at 278, 609 A.2d 400, and so, in the particular circumstances presented in this case, we are constrained to reverse her conviction and remand for new proceedings.

IV.
Because we find that A.S.'s confession was not voluntarily given under the totality of the circumstances test as described in Presha, our decision does not hinge on whether F.D. had a conflict of interest that rendered her unable to fulfill the parental role contemplated by Presha. Nonetheless, because we have concerns about F.D.'s interests and because the Appellate Division addressed the issue, we add the following.
Toward the conclusion of its thorough and thoughtful opinion, the Appellate Division added this rather expansive directive:
[i]n circumstances such as those existing in the present matter, where the adult advisor is known to have a close family relationship to both the victim and the alleged perpetrator, the prudent approach would be to require the presence of an attorney capable of advising the juvenile with respect to her rights and her potential culpability, a procedure adopted elsewhere.
[A.S., supra, 409 N.J.Super. at 122-23, 975 A.2d 1060 (citations omitted).]
We do not believe that a broad representation requirement that would require the presence of an attorney in every such case is warranted. As we have discussed *1150 throughout this opinion, the presence of a parent is a "highly significant factor" in the totality of the circumstances analysis contemplated by Presha and, generally, that reassuring presence will assist the juvenile in the exercise of his or her rights. We decline to embrace a categorical rule that an attorney must be present any time that there is perceived clash in the interests of a parent based on a familial relationship with the victim or another involved in the investigation. Even in cases of such apparent clashing interests, a parent may be able to fulfill the role envisioned in Presha. And, in those cases where a parent is truly conflicted,[6] another adultnot necessarily an attorney may be able to fulfill the parental assistance role envisioned by Presha. Moreover, when it is apparent to interrogating officers that a parent has competing and clashing interests in the subject of the interrogation, the police minimally should take steps to ensure that the parent is not allowed to assume the role of interrogator and, further, should strongly consider ceasing the interview when another adult, who is without a conflict of interest, can be made available to the child.

V.
The judgment of the Appellate Division is reversed and the matter is remanded for new proceedings consistent with this opinion.
For reversal and remandmentChief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA-SOTO, and HOENS7.
OpposedNone.
NOTES
[1] It appears that since the incident described herein, F.D. and A.S. no longer have any contact with each other, and F.D. has moved to terminate the adoption.
[2] The trial court appropriately rejected the transcript of the videotape that was offered into evidence because it was inaccurate and incomplete. In such a circumstance, "[u]nless a transcript thereof is marked into evidence, a verbatim record shall also be made of the content of an audio or video tape played during the proceedings...." R. 1:2-2.
[3] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[4] The particular Parent/Guardian Waiver Form used in this matter was argued to contain some internal inconsistencies, which may deserve review to eliminate the possibility of ambiguity and confusion. We are unable to discern from the record whether the form is county-specific or is being used generally across the state to provide uniform guidance in child-interrogation settings. Because the Attorney General is participating in this appeal, we commend to her considered judgment the suggestion for uniformity in this area.
[5] Although it was not necessary to our decision in Presha, supra, we also adopted a special per se rule for juveniles under the age of fourteen that "when a parent or legal guardian is absent from an interrogation involving a juvenile that young, any confession resulting from the interrogation should be deemed inadmissible as a matter of law, unless the adult was unwilling to be present or truly unavailable." 163 N.J. at 315, 748 A.2d 1108.
[6] Clashing parental interests may be present in situations other than when the parent is related to both the suspect and the victim. A conflict of interest may arise if the parent is a suspect, and also may present itself if the parent has a familial or intimate relationship with another suspect. See generally Hilary B. Farber, The Role of the Parent/Guardian in Juvenile Custodial Interrogations: Friend or Foe?, 41 Am.Crim. L.Rev. 1277, 1293-98 (2004). The State must, and generally does, exercise great sensitivity in such circumstances. To the extent that actions by sister states may provide additional helpful guidance, we note the practical approach taken by the Supreme Court of Vermont, which does allow for the presence of a disinterested independent adult to assist a juvenile being interrogated. See State v. Mears, 170 Vt. 336, 749 A.2d 600 (2000). In a case in which a juvenile claimed that his statements to the police should not have been admitted at trial because the juvenile's father acted in a manner opposed to the juvenile's interests, that court stated that it would apply the following criteria in determining whether the statements were knowing, intelligent, and voluntary:

(1) he must be given the opportunity to consult with an adult; (2) that adult must be one who is not only genuinely interested in the welfare of the juvenile but completely independent from and disassociated with the prosecution, e.g., a parent, legal guardian, or attorney representing the juvenile; and (3) the independent interested adult must be informed and be aware of the rights guaranteed to the juvenile.
[Id. at 604 (quoting In re E.T.C., 141 Vt. 375, 449 A.2d 937, 940 (1982)).]