**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0117-15T2

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

EDWIN A. JIMENEZ, a/k/a SURIEL
ADAN CUBENO-JIMENEZ,

    Defendant-Appellant.

_____

Submitted January 29, 2018 — Decided June 18, 2018

Before Judges Messano and O'Connor.

On appeal from Superior Court of New Jersey,
Law Division, Passaic County, Indictment Nos.
11-02-0117 and 12-08-0637.

Joseph E. Krakora, Public Defender, attorney
for appellant (Susan Brody, Deputy Public
Defender, of counsel and on the brief).

Camelia M. Valdes, Passaic County Prosecutor,
attorney for respondent (Tom Dominic Osadnik,
Assistant Prosecutor, of counsel and on the
brief).

Appellant filed a pro se supplemental brief.

PER CURIAM

A jury convicted defendant Edwin A. Jimenez of two counts of passion/provocation manslaughter in the deaths of I.P. and S.M., N.J.S.A. 2C:11-4(b)(2); second-degree aggravated assault of D.V., N.J.S.A. 2C:12-1(b) (causing serious bodily injury (SBI)); three counts of second-degree possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1); and second-degree illegal possession of a handgun, N.J.S.A. 2C:39-5(b)(1).[1] The same jury found defendant guilty after a bifurcated second trial of second-degree possession of a firearm by certain persons prohibited from having such weapons, N.J.S.A. 2C:39-7(b). The judge imposed three consecutive nine-year terms of imprisonment on the manslaughter and aggravated assault convictions, each subject to the No Early Release Act, N.J.S.A. 2C:43-7.2, and a consecutive eight-year term of imprisonment, with a five-year period of parole ineligibility, on the certain persons conviction.

Defendant raises the following points for our consideration:

> POINT I
>
> THE COURT ERRED IN REFUSING TO SUPPRESS DEFENDANT'S STATEMENT BECAUSE THE POLICE INTERROGATOR THREATENED HIM WITH THE DEATH PENALTY AND COERCED HIM BY GIVING HIM FALSE INFORMATION ABOUT THE LAW, SOME OF WHICH

---

[1] The jury returned verdicts of passion/provocation manslaughter as lesser-included offenses of the two murder counts in the indictment; the SBI aggravated assault was a lesser-included offense of attempted murder. We use initials to keep the victims' identities confidential.

DIRECTLY CONTRADICTED THE <u>MIRANDA</u> WARNINGS HE HAD JUST RECEIVED.

POINT II

THE TRIAL WAS IRREPARABLY TAINTED BY THE PROSECUTOR'S MULTIPLE ACTS OF MISCONDUCT. (NOT RAISED BELOW)

POINT III

THE 35-YEAR AGGREGATE SENTENCE IMPOSED WAS MANIFESTLY EXCESSIVE.

Appellant also provided additional points for our consideration in his pro se supplemental brief.

POINT I

THE DEFENDANT'S CONVICTION ON COUNT 5 MUST BE REVERSED BECAUSE THE TRIAL COURT'S JURY INSTRUCTION ON AGGRAVATED ASSAULT-SERIOUS BODILY INJURY WAS FATALLY FLAWED. THIS ERROR DEPRIVED THE DEFENDANT OF A PROPERLY INSTRUCTED JURY AND A FAIR TRIAL, IN VIOLATION OF <u>U.S. CONST.</u> AMENDS. VI, XIV. (NOT RAISED BELOW).

POINT II

ABSENT RELEVANT MEDICAL EVIDENCE TO SUSTAIN A LESSER-INCLUDED OFFENSE ON COUNT 5, THE TRIAL COURT ERRED BY INSTRUCTING THE JURY ON AGGRAVATED MANSLAUGHTER-SERIOUS BODILY INJURY; OR IN THE ALTERNATIVE, BY NOT ENTERING A JUDGMENT OF ACQUITTAL DUE TO LACK OF EVIDENCE OF THE SERIOUSNESS OF THE VICTIM'S INJURIES TO SUPPORT A CONVICTION ON AGGRAVATED ASSAULT-SERIOUS BODILY INJURY. (NOT RAISED BELOW).

THE JUDGMENT OF CONVICTION ON COUNT 5 REFLECTS THE DEFENDANT WAS SENTENCED ON AGGRAVATED ASSAULT-BODILY INJURY, PURSUANT TO N.J.S.A. 2C:12-1(b)(7). THE DEGREE OF THE CRIME IS INCORRECTLY LISTED AS A SECOND-DEGREE CRIME INSTEAD OF A THIRD-DEGREE CRIME. THE COURT MUST RESOLVE THIS CONFLICT. (NOT RAISED BELOW)

Having considered these arguments in light of the record and applicable legal standards, we affirm defendant's conviction, and the sentences imposed. We remand solely for the filing of a corrected judgment of conviction (JOC).

I.

We briefly synopsize the State's evidence to place defendant's arguments in context.

At approximately 7:00 p.m. on February 18, 2012, the three victims and a fourth man, A.M., were standing outside a bodega in Passaic. Defendant walked toward them and began firing a handgun. A.M. ran inside the bodega, pulled D.V., who had already been shot, inside the store and hid behind a counter. Defendant fired through the door of the store, shattering the glass, and fled. There were no spent shell casings at the scene, but police recovered two projectiles from inside the store and an apparent hallway.

A.M. also fled, but police found him later in the evening and took a statement from him. A.M. identified a photograph of defendant as the shooter, and also identified defendant in court, testifying that he knew him from high school.[2]

Around midnight, Clifton police stopped a motor vehicle driven by defendant's brother; defendant was the front seat passenger. Defendant had two bags of marijuana in his jacket, and police found a revolver under the driver's seat.

Passaic Police Department Detective Alex Flores interrogated defendant. After conducting a hearing pursuant to N.J.R.E. 104(c), which we discuss below, the judge admitted defendant's video-recorded statement to Flores. Defendant admitted that he bought the gun earlier in the evening of February 18 for $300 and shot all three men, who defendant knew from school. Defendant claimed the men were "after him," and had allegedly fired shots at defendant one week earlier.

Defendant did not testify or call any witnesses.

---

[2] The jury acquitted defendant of the attempted murder of A.M. and related weapons charge.

Detective Flores was the only witness at the pretrial hearing on the admissibility of defendant's statement to police.[3] Defendant and the detective are bilingual, and the statement, although mostly in English, included snippets of questions and answers in Spanish. The prosecutor told the judge a transcript was prepared that included translations of the Spanish words, that she and defense counsel had reviewed the transcript and, but for minor modifications, agreed it was accurate.

Flores knew A.M. had already identified defendant as the shooter. He initially questioned defendant about the gun found in the car, reminding defendant that he knew defendant's father and had his cellphone number. Defendant did not immediately provide any information, other than his alleged whereabouts earlier that evening. Flores told defendant that he was a young man, and he would help himself by telling the truth. Defendant

---

[3] At the start of the interrogation, defendant indicated he was more comfortable speaking Spanish. The detective utilized a Spanish language Miranda rights form that he read aloud as defendant followed along, indicating he understood each right before signing the form and agreeing to speak to Flores. Miranda v. Arizona, 384 U.S. 436 (1966). The judge found that defendant knowingly and voluntarily waived his Miranda rights, a finding that defendant does not challenge on appeal.

soon told Flores he purchased the gun from an unnamed person just hours before the shooting.

At that point, Flores told defendant he was suspected in the homicides, intimating that ballistics could match the bullets recovered from the victims to defendant's gun.[4] Flores said:

> [I]f it wasn't you, that's fine. Talk to me. I'm telling you this. Like I told you before that the game you're in right now, you're never gonna see the sun. Two dead, one injured. In this country, it isn't . . . the death penalty but if they look for it, they can find it. You're 20 years old. In this moment you have to think clearly. If you did something, say it because this — this is the only thing that the judge wants to hear.

Defendant asked Flores "[w]hat can happen to my brother?" Flores told defendant he had not yet spoken to the others in the car, including defendant's brother, but that defendant should "worry about [himself] right now."

Defendant asked, "How many years do you think they'll give me?" Flores responded,

> For cases that I've had that people don't say s***, they hit them hard. They hit hard with 30, 50 years . . . .
>
> When you help yourself, they see that. When you sit here and lie . . . they hit you hard

---

[4] No ballistic testing had been done at that point. At trial, the parties stipulated that the analysis of four projectiles, two recovered from the scene and two recovered from the bodies of the deceased, was inconclusive.

> bro. I ain't going to lie, they f*** the s***
> out of you.
>
> . . . .
>
> Not even for lying, just from making . . . me
> work and making them work to find out the truth
> when we already know the truth.

Thirty-two minutes into the interrogation, defendant confessed to the shootings. He identified pictures of the three victims and A.M. Defendant again indicated his brother, who had a young son, had nothing to do with the shooting.

After hearing the argument of counsel, the judge rendered an oral decision. He noted the ability to view the video recording was "critical" to his assessment of the "totality of the circumstances" and his consideration of whether the "statement itself was voluntary and not the product of coercion, or official misconduct." The judge said Flores' reference to the "death penalty" was a "red herring," because it was vague and came in the context of a discussion of "potential penalties." He paraphrased Flores' remarks to defendant as "look there's no question, you're gonna get jail time here. I can't really tell you how much . . . . I don't know. I can't tell you that." The judge went on to find:

> [W]hat you have is a very cordial and very
> comfortable exchange between the defendant and
> the police officer. The mere fact that this
> police officer apparently knows the defendant
> from the streets, knows the defendant's
> brother, knows his parents, shouldn't work

8

against the police. That would be . . . ludicrous.

In fact, it seemed at least, to put the defendant in a comfort zone. There was no raising of voices, there was no overt coercive acts on the part of the officer. There were no major misrepresentations by the officer. . . . [I]t appeared at times that the officer . . . had a genuine concern for the defendant, and particularly for the defendant's father.

. . . .

[W]hen you look at that entire tape, I can't see how anybody can walk away from it and say, there was this coercive aspect to it, which renders the statement . . . involuntary.

Defendant contends Flores' statements urging him to provide information as the only way to help himself or garner favor with a judge essentially contradicted the Miranda warnings and neutralized defendant's waiver of those rights. We disagree.

"Appellate courts reviewing a grant or denial of a motion to suppress must defer to the factual findings of the trial court so long as those findings are supported by sufficient evidence in the record." State v. Hubbard, 222 N.J. 249, 262 (2015) (citing State v. Gamble, 218 N.J. 412, 424 (2014); State v. Elders, 192 N.J. 224, 243 (2007)). We apply this deferential standard "even [to] factfindings based solely on video or documentary evidence," "taking corrective action [only] when factual findings are so clearly mistaken -- so wide of the mark -- that the interests of

justice demand intervention." State v. S.S., 229 N.J. 360, 379, 381 (2017). "By contrast, the task of appellate courts generally is limited to reviewing issues of law," which we do de novo. Id. at 380.

Even when Miranda warnings are properly administered, "the State bears the burden of proving beyond a reasonable doubt that a defendant's confession is voluntary and not resultant from actions by law enforcement officers that overbore the will of a defendant." Hubbard, 222 N.J. at 267 (citing State v. Hreha, 217 N.J. 368, 383 (2014); State v. Galloway, 133 N.J. 631, 654 (1993)). "Determining whether the State has met that burden requires a court to assess 'the totality of the circumstances, including both the characteristics of the defendant and the nature of the interrogation.'" Hreha, 217 N.J. at 383 (quoting Galloway, 133 N.J. at 654).

Defendant cites cases in which the interrogation techniques employed by law enforcement actually contradicted or undermined the Miranda warnings, resulting in suppression of the defendant's statement. In State v. Pillar, 359 N.J. Super. 249, 268 (App. Div. 2003), we held that a detective's "acquiescence to hear an 'off-the-record' statement" from the defendant "totally undermine[d] and eviscerate[d] the Miranda warnings." Similarly in State v. Fletcher, 380 N.J. Super. 80, 87-88 (App. Div. 2005),

10

one detective, a friend of the family, told defendant, "If you come in and help us off-the-record, it's a feather in your cap, it will help you. It is good for you to cooperate . . . ." The defendant waived his rights and gave an incriminating statement to another detective. Id. at 88. Relying on Pillar, we concluded the defendant's statement was "induced by the promise and not freely and voluntarily given." Id. at 82. Lastly, in State v. Puryear, 441 N.J. Super. 280 (App. Div. 2015), we suppressed the defendant's statement because the detective, in explaining the Miranda rights' caveat that anything said could be used against the defendant, told him that meant, "if you lie, it can be used against you." Id. at 290.

None of these cases support defendant's argument in this case because Flores never represented the statement would be "off-the-record," nor did he incorrectly explain the Miranda warnings. At most, Flores told defendant it would be in his best interest to tell the truth.

In this regard, defendant relies on State ex rel. A.S., 203 N.J. 131 (2010). Citing Pillar, the Court there agreed the detective should not have told the fourteen-year-old defendant that answering his questions "would show that she was a 'good person' and would actually benefit [the defendant]." Id. at 150-51. "Not only was the veracity of such advice dubious, a fact of

11

which an attorney would have made A.S. aware, it also contradicted the Miranda warning provided to A.S.: that anything she said in the interview could be used against her in a court of law." Ibid.

However, we view A.S. as distinguishable from the facts of this case. Defendant is not a juvenile and, at age twenty, already had familiarity with the criminal justice system. See id. at 149 (noting A.S. was "on the cusp for heightened protections because a fourteen-year-old is still of tender sensibilities and may have great difficulty withstanding the rigors of a police interrogation"). A.S.'s parent, although present, failed to act as the buffer between police and her stepdaughter, and actually assisted police in overriding the child's reluctance to answer questions. Id. at 149-50. The parent's misstatements of law regarding Miranda went uncorrected by police. Id. at 150-51. The Court suppressed the statement based upon the totality of these circumstances, id. at 152, not solely the officer's assurance that A.S. could help herself by providing a statement.

The Court has long recognized that "[e]fforts by a law enforcement officer to persuade a suspect to talk 'are proper as long as the will of the suspect is not overborne.'" State v. Maltese, 222 N.J. 525, 544 (2015) (quoting State v. Miller, 76 N.J. 392, 403 (1978)). "The inquiry turns on 'whether an investigator's statements were so manipulative or coercive that

12

they deprived [defendant] of his ability to make an unconstrained, autonomous decision to confess.'" Ibid. (alteration in original) (quoting State v. Di Frisco, 118 N.J. 253, 257 (1990)).

In Miller, 76 N.J. at 403-04, the Court squarely considered

> "whether an interrogating officer can appeal to a suspect by telling him that he is the suspect's friend and wants to help him. . . . Does the officer have the right to tell the suspect that he must help himself first by telling the truth and then the officer will do what he can to help the suspect with his problem?"

The Court conceded "this technique moves into a shadowy area and if carried to excess in time and persistence, can cross that intangible line and become improper." Id. at 404. However, "[e]fforts by an interrogating officer to dissipate" a suspect's "natural reluctance to admit to the commission of a crime" "and persuade the person to talk" are proper unless the suspect's will is overborne. Id. at 403.

In this case, the factual findings made by the judge were supported by substantial, credible evidence in the record. Flores' questioning was relatively brief, and he told defendant that he would be incarcerated whether he made a statement or not. The detective's dubious claim about the likelihood of defendant's cooperation leading to a lesser sentence should not be condoned. Nevertheless, as the judge found based upon the overall tenure of

the interview, Flores' interrogation techniques did not overbear defendant's free will.

### III.

Defendant argues the prosecutor's "multiple acts of misconduct," none of which was objected to by defense counsel at trial, require reversal. Again, we disagree.

While prosecutors are entitled to zealously argue the merits of the State's case, State v. Smith, 212 N.J. 365, 403 (2012), they occupy a special position in our system of criminal justice. State v. Daniels, 182 N.J. 80, 96 (2004). "[A] prosecutor must refrain from improper methods that result in a wrongful conviction, and is obligated to use legitimate means to bring about a just conviction." Ibid. (quoting State v. Smith, 167 N.J. 158, 177 (2001)).

In considering defendant's argument, we examine whether a timely objection was made, whether the remarks were withdrawn, or whether the judge acted promptly and provided appropriate instructions. Smith, 212 N.J. at 403. "Generally, if no objection was made to the improper remarks, the remarks will not be deemed prejudicial." State v. R.B., 183 N.J. 308, 333 (2005). Even if the prosecutor exceeds the bounds of proper conduct, "[a] finding of prosecutorial misconduct does not end a reviewing court's inquiry because, in order to justify reversal, the misconduct must

have been 'so egregious that it deprived the defendant of a fair trial.'" <u>Smith</u>, 167 N.J. at 181 (quoting <u>State v. Frost</u>, 158 N.J. 76, 83 (1999)).

In her opening, the assistant prosecutor invited jurors to imagine themselves at the scene of the homicides and then described, in somewhat gruesome detail, what they would have seen. In his summation, a different assistant prosecutor attempted to explain A.M.'s reluctance to sign defendant's photograph when questioned by police on the night of the homicides and his initial reluctance to testify when called at trial.

> Now, I am sure none of us have ever experienced anything like [A.M.] did. I certainly hope so and I'm sure you would be sure enough to share that with us if that was the case. But <u>there are a few times I'm going to ask you to kind of put yourself in somebody's shoes</u>. Think about this.
>
> Think about what that must be like. [A.M.] was shot at, saw all of his friends [sic] blood, saw his two friends outside, one dead, clearly the other, you know, where it's headed. What must that be like? <u>How does that make you feel?</u>
>
> <u>How do you react to that?</u> Well, we've got to follow [A.M.] a little bit and his reaction. He's taken to police headquarters and he knows, of course, the police are going to ask him . . . what happened. Now, if any of us was in that situation and somebody asked us what should we do.
>
> Of course, you tell the police you saw the shooting. You tell them two kids are dead.

15

> Of course. It's innocent heinous, right? <u>Well, put yourself in his shoes</u>. You're at police headquarters. You saw somebody commit cold blooded murder.
>
> What do you do? What do you do? Is it so easy to sit there and tell the police I saw it, I know who did it because you still live there and you have a family. What do you do? Is it such an easy decision?
>
> [(emphasis added).]

We do not countenance emotional appeals to the jury. <u>State v. Blakney</u>, 189 N.J. 88, 96 (2006). Moreover, asking the jurors to place themselves in the shoes of the victim has been soundly discouraged by other courts that have considered the tactic. <u>See, e.g.</u>, <u>Tyree v. United States</u>, 942 A.2d 629, 643 (D.C. 2008). However, the prosecutor's opening remarks were brief and made at the very beginning of a trial that lasted several days. As to the summation comments, we note that defense counsel portrayed the shootings as "brutal indeed," described the "copious amounts of blood" at the scene, and the victims' pleas for life. He called the homicides "call[o]us and cold-blooded," perhaps "an assassination." "Our task is to consider the fair import of the State's summation in its entirety," <u>State v. Jackson</u>, 211 N.J. 394, 409 (2012) (citations omitted), particularly in light of defense counsel's failure to object. The prosecutor's comments did not deprive defendant of a fair trial.

16

Defendant also argues the prosecutor laced her direct examination of Flores before the jury with improper questions calling upon the detective to interpret what was happening, or explain what defendant was doing, as the jury viewed the video-recorded statement. At points, despite no objection by defense counsel, the judge interrupted and admonished the prosecutor. In doing so, the judge acted properly, because we have no doubt these questions were inappropriate. However, we are convinced that the prosecutor's actions did not amount to plain error requiring reversal. R. 2:10-2.

To the extent we have not otherwise specifically addressed them, defendant's remaining claims of prosecutorial misconduct and the alleged cumulative effect of the prosecutor's actions do not warrant discussion in a written opinion. R. 2:11-3(e)(2).

IV.

In his pro se supplemental brief, defendant challenges the jury's guilty verdict on count five of the indictment. As noted, the jury found defendant guilty of second-degree SBI aggravated assault of D.V. as a lesser-included offense of attempted murder. Defendant contends the judge repeated a portion of the charge after giving jurors a break, thereby unduly emphasizing the requisite mental state required for a conviction, and used "bodily

17

injury" instead of "serious bodily injury" at one point during the charge.

Defendant also argues the judge erred in submitting SBI aggravated assault to the jury because D.V. did not testify and there was insufficient proof that he suffered "serious bodily injury" as a result of the shooting.

These arguments lack sufficient merit to warrant discussion. R. 2:11-3(e)(2). The judge properly explained the elements of SBI bodily injury. D.V. suffered gunshot wounds to the face and shoulder, and his hospital records were admitted into evidence by stipulation.

Lastly, defendant properly points out that the JOC incorrectly lists count five as a conviction for aggravated assault, N.J.S.A. 2C:12-1(b)(7), causing significant bodily injury, a third-degree crime. We therefore remand the matter to the trial court to correct the JOC to reflect defendant's conviction under count five for SBI aggravated assault, N.J.S.A. 2C:12-1(b)(1).

V.

Defendant contends the aggregate thirty-five year sentence was manifestly excessive. He points to comments made by the judge as indicative of the judge's intention to impose the harshest possible sentence because of the jury's decision to acquit

18

defendant of two murders. Defendant contends the judge

inappropriately applied the Yarbough[5] factors to impose

_____

[5] The Yarbough factors are:

> (1) there can be no free crimes in a system for which the punishment shall fit the crime;
> (2) the reasons for imposing either a consecutive or concurrent sentence should be separately stated in the sentencing decision;
> (3) some reasons to be considered by the sentencing court should include facts relating to the crimes, including whether or not:
>> (a) the crimes and their objectives were predominantly independent of each other;
>> (b) the crimes involved separate acts of violence or threats of violence;
>> (c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;
>> (d) any of the crimes involved multiple victims;
>> (e) the convictions for which the sentences are to be imposed are numerous;
> (4) there should be no double counting of aggravating factors;
> (5) successive terms for the same offense should not ordinarily be equal to the punishment for the first offense[.]
>
> [State v. Yarbough, 100 N.J. 627, 643-44 (1985).]

(footnote continued next page)

consecutive sentences on the passion/provocation manslaughters and SBI aggravated assault.

We begin by recognizing "[a]ppellate review of sentencing is deferential, and appellate courts are cautioned not to substitute their judgment for those of our sentencing courts." State v. Case, 220 N.J. 49, 65 (2014) (citing State v. Lawless, 214 N.J. 594, 606 (2013)). Generally, we only determine whether:

> (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience.
>
> [State v. Fuentes, 217 N.J. 57, 70 (2014) (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

Furthermore, "trial judges have discretion to decide if sentences should run concurrently or consecutively." State v. Miller, 205 N.J. 109, 128 (2011). "When a sentencing court properly evaluates the Yarbough factors in light of the record, the court's decision will not normally be disturbed on appeal." Id. at 129.

---

(footnote continued)
A sixth factor, imposing an overall outer limit on consecutive sentences, was superseded by legislative action. See State v. Eisenman, 153 N.J. 462, 478 (1998).

Here, the judge found aggravating factors one, three, six and nine. See N.J.S.A. 2C:44-1(a)(1) (nature and circumstances of the offense, including whether it was committed in an especially heinous, cruel or depraved manner); (3) (risk of re-offense); (6) (the extent of prior criminal record and seriousness of current offense); (9) (need to deter defendant and others). Hewing closely to the jury's actual verdict of passion/provocation manslaughter, the judge accepted defendant's argument that mitigating factors three and five applied. See N.J.S.A. 2C:44-1(b)(3) (defendant acted under strong provocation); (5) (the victim induced or facilitated defendant's conduct). The judge considered the Yarbough factors, relying extensively upon the Court's decision in State v. Carey, 168 N.J. 413 (2001).

The sentencing transcript evidences a thoughtful consideration by the judge of all relevant factors. We commend the judge for such a comprehensive analysis, with frequent citation to case law. We certainly find no mistaken exercise of his broad discretion in fashioning the appropriate sentence in this case.

Affirmed. The matter is remanded solely for correction of the JOC as to count five.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-0117-15T2